# ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

AUG 2 5 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CHEP USA, a New York Partnership, ) ) ) | |
| Plaintiff, ) | |
| ) | Case No. 02-CV-2053-BBM |
| v. ) ) | |
| MOCK PALLET COMPANY, a Georgia Corporation, ) ) ) | |
| Defendant. ) | |

## PLAINTIFF CHEP USA'S REPLY IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

The Court is familiar with the legal issues this case presents and with the

facts entitling CHEP to summary judgment.  Now, another United States district

court, faced with nearly identical legal issues and similar facts, has issued a

comprehensive opinion providing compelling guidance for the Court.  On August

11, 2003, Chief Judge Walter Herbert Rice of the Southern District of Ohio1 issued

a 47 page opinion in Buckeye Diamond Logistics, Inc. v. CHEP USA, holding that

---

1     While Buckeye arose under Ohio law, Georgia and Ohio law is virtually
identical on all the issues related to CHEP's ownership of its pallets.  While
Buckeye is not binding authority, it is certainly compelling guidance for the Court.

58

"without question that CHEP has at all times retained ownership in its pallets."

Case No. C-3-01-440, slip op., (S.D. Ohio August 11, 2003) (Slip Opinion attached

as Exhibit A).

In making its rulings, the Buckeye court addressed and rejected the very

same arguments Mock Pallet Co. ("MPC") raises here, and found that the evidence

undisputably showed as a matter of law that:

- CHEP's agreements with its customers are true leases, not sales. Buckeye, slip op. at 22.

- The fact that some pallets may leak out of CHEP's pallet pool does not change the character of CHEP's agreements with its lessees. Id. at 28-29.

- The fact that CHEP collects lost equipment fees does not convert its leases into sales. Id. at 29-30, 37-38.

- NPDs can never be "good faith purchasers" under the Uniform Commercial Code because they do not "purchase" CHEP pallets and because their knowledge of CHEP's ownership claim destroys any "good faith" argument. Id. at 30-31.

- CHEP does not "abandon" its pallets. Id. at 32-34.

The court's analysis of CHEP's rental agreements, its thorough examination of

CHEP's policies and practices, and its reasoned application of UCC principles are

instructive here and further establish that CHEP is entitled to summary judgment.[2]

---

2 CHEP also addresses below other legal issues raised by MPC that were not addressed in CHEP's prior briefing.

**A.    As Demonstrated in <u>Buckeye</u>, CHEP Never Relinquishes Ownership of Its Pallets**

**1.    The Facts of <u>Buckeye</u> Are Indistinguishable From This Case**

Like MPC, Buckeye is a pallet recycler in wrongful possession of CHEP pallets and its lawsuit with CHEP involves facts and legal issues nearly identical to those presented here.[3] "[Buckeye] inevitably comes into possession of [CHEP pallets] on occasion by virtue of its service of collecting unsorted used pallets, in bulk, from various commercial sites where they tend to accumulate, such as those of distributors and wholesalers, which do not have agreements with CHEP." <u>Buckeye</u>, slip op. at 9. Like all recyclers, Buckeye had received numerous notices from CHEP regarding CHEP's ownership claim over its pallets. Buckeye claimed that it, like MPC, purchased pallets sight-unseen and could not help but acquire some

---

[3]    The posture of <u>Buckeye</u> is slightly different from this case. Buckeye sued CHEP for declaratory judgment, claiming (1) that CHEP, by asserting its ownership rights, violated the Ohio Deceptive Trade Practices Act; (2) that the CHEP pallets in Buckeye's possession had been either lost or abandoned by CHEP; (3) that Buckeye has a common law lien on the CHEP pallets in its possession as a result of sorting and storing the pallets, (4) that Buckeye was entitled to damages for unjust enrichment; and (5) that CHEP had tortiously interfered with Buckeye's business relationships. CHEP counterclaimed for replevin, conversion, and for a permanent injunction to prevent Buckeye from interfering with its ownership and possessory rights in CHEP pallets. <u>Buckeye</u>, slip op. at 2-3. CHEP and Buckeye filed cross-motions for summary judgment on Buckeye's claims, and Buckeye moved for summary judgment on CHEP's counterclaims. Importantly, CHEP did not move for summary judgment on its counterclaims.

CHEP pallets.[4]

## 2.   CHEP's Agreements Are Leases, Not Sales

Like MPC, Buckeye argued that CHEP's agreements with its customers are not true leases, but rather represent sales of CHEP pallets.  The Court in <u>Buckeye</u> rejected this approach, holding that

> [i]n this case, the <u>Rental Agreement used by CHEP represents a true lease</u>.  In exchange for the use of CHEP pallets to ship their goods, manufacturers agree to pay CHEP consideration in the form of rent for as long as CHEP pallets remain in their possession.  When an equal number of those pallets are returned to CHEP or recorded as having been transferred into the possession of a downstream entity, be it a secondary customer of CHEP or some other party, the manufacturers' lease terms are deemed complete.  Pursuant to the terms of the Rental Agreement, which CHEP lessees, by all appearances, have entered into freely and willingly, the lessees agree that the consideration they pay does not entitle them to title in the CHEP pallets.  CHEP, in turn, assumes the risk of recovering its pallets from its secondary customers and other downstream entities which come into possession of its pallets.  Buckeye has not pointed to any legal authority demonstrating that such an agreement cannot be characterized as a lease.

<u>Buckeye</u>, slip op. at 29 (emphasis supplied).

---

[4]      Unlike MPC, Buckeye did not "purchase" or sell CHEP pallets, but claimed to receive them free of charge.  The court does not explain the relevance of this fact, except in addressing Buckeye's claim that it took title to CHEP pallets as "gifts."  This fact, however, is irrelevant to issues presented here because CHEP's ownership rights are driven by CHEP's agreements with its customers and its conduct in asserting its ownership claim, not the nature of the transaction between MPC and its customers.  Moreover, MPC is not asserting a "gift" defense in this case.

Likewise, the fact that the lease agreement requires a lessee to pay a lost equipment fee for CHEP pallets it cannot account for it is of no consequence because it "does not evidence an intent to sell, rather than lease, CHEP pallets." Id. at 29-30. Moreover, MPC does not have any evidence that CHEP colleted any lost equipment fee for the CHEP pallets in MPC's possession. See id. at 38, fn. 18 ("[I]t was incumbent upon Buckeye to adduce facts creating a genuine issue as to whether the CHEP pallets within its possession were lost or abandoned.")[5] CHEP's agreements provide *no* option to purchase CHEP pallets for any price under any circumstances. CHEP pallets simply are not sold, and its leases cannot be construed as sales. (See Norder Aff. ¶ 4). See also Tri-Continental Leasing Corp. v. Charles Beale & Co., Inc., 709 F. Supp. 218, 220 (N.D. Ga. 1989) (holding agreement to be a lease when agreement did not provide for the transfer of ownership or an option to purchase.)

---

[5]     The Buckeye court further noted: "At best, the fact that CHEP collects a 'lost pallet' fee would allow Buckeye to raise a defense to a claim for damages, were CHEP to claim that it has suffered damages on account of Buckeye's refusal to return a particular pallet. Even then the defense would only be meritorious were Buckeye able to show that a particular CHEP pallet within its possession was a pallet for which CHEP had collected a 'lost pallet' fee." Buckeye, slip op. at 38, n. 18. Of course, since MPC receives CHEP pallets primarily from known NPDs, it is unlikely that CHEP assessed lost equipment fees for those CHEP pallets in its possession. (See Norder Aff. ¶ 9; Norder dep. at 84; CHEP Resp. to MPC's Mot. for Summary Judgment at 6).

### 3.   The "Opening" of CHEP's Pallet Pool Does Not Affect CHEP's Ownership of Its Pallets

Applying the same UCC provision applicable here,[6] the court in <u>Buckeye</u>

held "that the opening of the system does not change the inherent nature of CHEP's

relationships with those with which it has contractual agreements." <u>Id.</u> at 28. This

is because an NPD or recycler cannot be a good faith purchaser for value or a buyer

in the ordinary course of business. <u>See id.</u> The court in <u>Buckeye</u> provided several

reasons for this result that equally apply here.

First, "[b]ecause CHEP's manufacturer-customers and secondary customers

do not, by contract, purchase CHEP pallets, they cannot sell CHEP pallets to

entities downstream from them." <u>Id.</u> at 30. MPC has presented no evidence that

the entities from whom it obtains CHEP pallets had the right to "sell" CHEP pallets

to MPC. This is, in part, because the entities from whom MPC primarily obtains

CHEP pallets are NPDs and these entities, therefore, did not "purchase" the CHEP

pallets they have provided to MPC.

Second, "given the multitude of notices issued by CHEP to any number of

parties in the pallet industry, and the notice 'PROPERTY OF CHEP,' inscribed on

all CHEP pallets, <u>no downstream entity could claim it was purchasing CHEP pallets</u>

---

6   Ohio Rev. Code § 1302.44 is identical to O.C.G.A. § 11-2-403.

in 'good faith.'" Id. (emphasis added).[7] This threshold finding blows a hole in the

foundation of MPC's case through which all its arguments inevitably fall. Contrary

to MPC's argument, it is not a "buyer in the ordinary course of business," because it

does not acquire CHEP pallets in "good faith" and "without knowledge" of CHEP's

ownership rights. The decision in Buckeye makes clear that the relevant fact is

CHEP's conduct in publicizing its ownership interest, not MPC's willingness to

bury its head in the sand, that controls:

> The facts adduced by both parties make it plain that neither the NPDs
> identified herein by Buckeye nor Buckeye itself qualify as such,
> because CHEP, both in the labeling of its pallets and through regular
> mailings, telephone calls and visitations to these entities, stresses
> without ambiguity that it is the owner of all CHEP pallets.

Id. at 31. MPC offers no evidence that the entities providing it with CHEP pallets

were good faith purchasers. Nor can MPC present such evidence because CHEP's

continuous efforts to notify NPDs and recyclers of its ownership claim, coupled

with the "PROPERTY OF CHEP" brand on each pallet, prevent any good faith

purchase.

MPC's argument that it had "no reason to believe that any of its three major

customers, or the Solid Rock Baptist Church were liars or thieves, when they

---

7    Ohio Rev. Code §§ 1310.01 and 1310.33 are identical to O.C.G.A. §§ 11-
2A-103 and 11-2A-305, respectively.

represented to MPC, that they own the CHEP-marked pallets" is without merit. (See MPC's Resp. to CHEP Mot. for Summary Judgment at 12). A person who finds a lost dog and delivers it to the humane society is obviously no criminal -- even if he erroneously believes he "owns" the dog by finding it -- and certainly cannot pass title in the dog to the humane society since he did not have title to begin with. Moreover, if the dog wears a tag proclaiming, "Property of CHEP," the humane society cannot reasonably believe the finder (who is not CHEP) was its rightful owner. This is particularly true if the humane society -- like MPC -- has received notice after notice from CHEP about its ownership of the dog.

### 4.   CHEP Has Not Abandoned Its Pallets

Even if Georgia recognized a cause of action for "abandonment" (which it does not), CHEP has not abandoned its pallets. In Buckeye, the court found that "CHEP exerts a significant amount of effort in an attempt to recover the CHEP pallets that have fallen into the hands of entities with which it does not have contractual agreements." Id. at 32. Like MPC, Buckeye argued that despite these efforts, CHEP's alleged failure to keep track of its pallets evidenced an intent to abandon. The court fully disagreed with this argument:

> The fact of the matter is, [CHEP] has always expressed an unambiguous intent to retain ownership of its pallets. That is the linchpin of the abandonment doctrine, not whether it has successfully

advanced its claims of ownership among entities with which it has no contractual relationships. . . . The facts demonstrate that while it allows lessees to use CHEP pallets to ship its goods to NPDs and the like, it also requires its lessees to notify it of such, takes affirmative steps to contact NPDs, actively asserts its claim of ownership, and attempts to negotiate terms for the recovery of its pallets.

Id., p. 33.

### 5.   The Doctrine of Mutuum, Even If Recognized Under Georgia Law, Does Not Apply Here

Buckeye also argued that the doctrine of mutuum applied to CHEP's agreements with its customers. After thoughtful consideration, the court rejected this argument because CHEP pallets are not "consumed" or "appropriated", but rather used and then returned to CHEP. Buckeye, slip op. at 25. Consistent with CHEP's form Rental Agreement, every pallet, at some point, is to be returned to CHEP. The Buckeye court also noted, "Business models have to adapt to business realities, and a court of law should not apply a rule dating back to Ancient Rome to hamper contemporary business practices." Id. at 7. In any event, MPC cites no Georgia case applying the concept of mutuum.

### B.   MPC's "Entrustment" and "Voidable Title" Arguments Fail Because MPC Is Not a Good Faith Purchaser

MPC argues that "a buyer, in the ordinary course of business, takes good title to goods even though the sale by the merchant violates the agreement with the true

owner." Regardless of the applicability of this general rule to these facts, MPC's argument fails because MPC cannot be a "buyer in the ordinary course of business." To be such a buyer, the purchaser must act in good faith. No downstream acquirer, especially one with actual knowledge of CHEP's ownership claim -- as MPC admittedly is -- can be a good faith purchaser. Buckeye, slip op. at 30.

Likewise, MPC's "voidable title" argument requires that MPC be a bona fide purchaser. O.C.G.A. § 11-2A-305. This inescapable fact defeats any argument that title to the pallets can pass to MPC.

## C.     CHEP Is Entitled to Injunctive Relief

MPC's argument in opposition to CHEP's request for an injunction is that CHEP has an adequate remedy at law -- it can stop shipping pallets to NPDs. This absurd argument is akin to arguing that banks can stop thieves from robbing them by not keeping any money in their vaults. An "adequate remedy at law" is "a legal remedy (such as an award of damages) that provides sufficient relief to the petitioning party, thus preventing the party from obtaining equitable relief." BLACKS LAW DICTIONARY 1296 (7th ed. 1999). Halting shipments to NPDs is not an adequate remedy at law. That MPC even makes this argument proves CHEP's point.

MPC admits that it does not intend to stop receiving CHEP pallets and does

not intend to return CHEP pallets to CHEP.  (R. Mock Depo. at 185, 191-92, 243).

If CHEP prevails in this lawsuit and recovers monetary damages and its pallets, this

will not prevent MPC from acquiring CHEP pallets in the future.  MPC's continued

tortious conduct in acquiring and refusing to return CHEP pallets will result in

irreparable harm to CHEP, because CHEP will be required to bring lawsuit after

lawsuit to recover the CHEP pallets that MPC converts.

The case MPC cites, Sampson v. Murray, 415 U.S. 61 (1974), for the

proposition that the loss of income *in absence of a stay* is inapposite.  In Sampson,

the Supreme Court refused to stay the termination of a government employee

despite the employee's argument that he would lose income during the course of the

lawsuit.  Id.  The Supreme Court held that the Back Pay Act, which provided for

back pay in the event of wrongful termination, was the exclusive remedy intended

by Congress and, therefore, a stay was inappropriate in light of this clear

congressional intention to provide a different remedy.  Id.

The Buckeye court denied Buckeye's motion for summary judgment on

CHEP's claim for injunctive relief.  CHEP did not move for summary judgment on

this claim, but the Court nevertheless stated: "To the extent Buckeye stands ready

to continue to collect CHEP pallets and deny CHEP its right to take possession of

same, this Court is authorized to enjoin it from doing so."  Buckeye, slip op. at 45.

11

MPC's final argument on CHEP's injunction claim is that an injunction is unnecessary if the Court issues a declaratory judgment that CHEP owns the pallets at issue, because MPC would not be a buyer in the ordinary course of business. CHEP does not understand this argument. Such a declaratory judgment would not prohibit MPC from obtaining CHEP pallets, merely from lawfully refusing to return them to CHEP. If MPC is suggesting that, suddenly aware of its tortious conduct, it will no longer obtain CHEP pallets, then CHEP concedes that an injunction would not be necessary. But MPC has previously stated its intention to continue to collect CHEP pallets, and, if MPC is to be believed, it could not conduct its business doing otherwise. Thus, an injunction is necessary to require MPC to notify CHEP of its acquisition of CHEP pallets.

**D.     CHEP Is Entitled To Summary Judgment on MPC's Claim for Unjust Enrichment**

The court in Buckeye found that disputed facts exist on Buckeye's claim for unjust enrichment, noting that "[a]t the end of the day, the concept of quasi contract is what this case is all about." Buckeye, slip op. at 42. The court, accordingly, denied summary judgment to CHEP on this claim. However, important facts distinguish Buckeye's claim for unjust enrichment from MPC's claim that entitle CHEP to summary judgment in this case.

Unlike MPC, Buckeye, without objection from CHEP, transferred CHEP pallets from one location of a CHEP customer to another location of the *same* CHEP customer.[8] On these facts, the court found that Buckeye serves as a "disinterested courier of CHEP pallets from one CHEP customer to another ...." Id. at 10. By contrast to Buckeye, MPC receives CHEP pallets with the intent to claim ownership of them and not simply as some disinterested courier. This is best evidenced by MPC's admitted efforts to "sell" CHEP pallets. CHEP has never ratified or even consented to such actions by MPC. See Reidling v. Holcomb, 225 Ga. App. 229, 232, 483 S.E.2d 624, 627 (1997) (holding that Georgia law requires proof that the party benefited by labor of another ratify or consent to actions to establish claim for unjust enrichment). Instead, CHEP repeatedly requested that MPC *not* pick up its pallets and that CHEP be allowed to retrieve the CHEP pallets in MPC's possession. (See R. Mock dep. at 315-317; Exhibits 11, 12, and 13 to CHEP Mem. of Law). CHEP filed this lawsuit only because refused to stop acquiring CHEP pallets and refused to return the CHEP pallets to CHEP.

---

[8] The court's opinion suggests that Buckeye was transferring CHEP pallets from one CHEP customer to another CHEP customer. Such an inference is incorrect, CHEP did not allow Buckeye to make such transfers -- and in fact would object to such transfers. CHEP has moved the court to clarify and correct this part of the

CHEP has conclusively demonstrated that MPC wrongfully converted CHEP pallets and that MPC, by its wrongful actions, is not entitled to unjust enrichment. Moreover, evidence of MPC's intent to continue its conduct coupled with CHEP's lack of an adequate remedy, entitles CHEP to injunctive relief. The opinion of the district court in Buckeye, while not presenting new law, underscores the merits of CHEP's arguments. Accordingly, CHEP's Motion for Summary Judgment should be granted.

This __25ᵗʰ__ day of August, 2003.

> Respectfully Submitted,
>
> KING & SPALDING, LLP
>
> *Robert B. Friedman*
>
> Chilton Davis Varner
> Georgia Bar No. 725450
> W. Randall Bassett
> Georgia Bar No. 041525
> Robert B. Friedman
> Georgia Bar No. 277711
>
> Attorneys for CHEP USA

191 Peachtree Street, N.E.
Atlanta, Georgia  30303-1763
(404) 572-4600

---

court's decision.

## CERTIFICATION OF COMPLIANCE WITH L.R. 5.1B

I hereby certify that the foregoing **PLAINTIFF CHEP USA'S RESPONSE IN OPPOSITION TO DEFENDANT MOCK PALLET CO.'S MOTION FOR PARTIAL SUMMARY JUDGMENT** has been computer processed with 14 point New Times Roman font in compliance with the United States District Court for the Northern District of Georgia Local Rule 5.1B.

This _25th_ day of August, 2003.

_Robert B. Friedman_

Robert B. Friedman
Georgia Bar No. 277711

Attorney for the Plaintiff

KING & SPALDING, LLP
191 Peachtree Street, N.E.
Atlanta, Georgia 30303-1763
(404) 572-4600 (voice)
(404) 572-5144 (facsimile)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CHEP USA, a New York Partnership, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 02-CV-2053-BBM |
| v. | ) ) | |
| MOCK PALLET COMPANY, a Georgia Corporation, | ) ) ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing PLAINTIFF

CHEP USA'S RESPONSE IN OPPOSITION TO DEFENDANT MOCK PALLET

CO.'S MOTION FOR PARTIAL SUMMARY JUDGMENT was served upon

counsel for defendant via hand delivery to:

Eugene D. Butt, Esq.
Ballard, Stephenson & Waters, LLP
P.O. Box 29
Covington, GA 30015

This 25ᵗʰ day of August, 2003.

*Robert B. Friedman*

Robert B. Friedman
**Georgia Bar No. 277711**

16



# EXHIBIT / ATTACHMENT

_____ A _____

(To be scanned in place of tab)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BUCKEYE DIAMOND LOGISTICS, INC.
fka BUCKEYE RECYCLERS,                    :
                                          Case No. C-3-01-440
          Plaintiff,                      :

                                          CHIEF JUDGE WALTER HERBERT RICE
          vs.                             :

CHEP USA,                                 :

          Defendant.                      :

---

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN
PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC.
#27), OVERRULING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT ON COUNT I OF ITS COMPLAINT (DOC. #30) AND
OVERRULING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON
DEFENDANT'S COUNTERCLAIMS (DOC. #29); PLAINTIFF'S
MOTION FOR LEAVE TO FILE MOTION TO COMPEL (DOC.
#45), PLAINTIFF'S MOTION FOR ORDER TO DEEM FACTS
ADMITTED (DOC. #48) AND DEFENDANT'S MOTION
TO EXCLUDE EVIDENCE REGARDING PLAINTIFF'S DAMAGES
(DOC. #56) ARE OVERRULED, AS MOOT; CONFERENCE CALL SET

---

This case concerns the ownership of certain wooden pallets used as

platforms for various manufactured goods as they travel through the stream of

commerce. Plaintiff Buckeye Diamond Logistics, Inc. ("Buckeye"), formerly

Buckeye Recyclers, is in the business of collecting, repairing, recycling, and/or

reselling pallets. Defendant CHEP USA ("CHEP") purports to be in the business of

"leasing" proprietary pallets ("CHEP pallets"). In the course of its business

operations, Buckeye inevitably comes into possession of CHEP pallets. It brought



this action after CHEP made repeated assertions that it was the true owner of all
CHEP pallets and was entitled to their return from Buckeye.

   Buckeye has asserted five counts in its Complaint (attached to Doc. #1).
Count One is for a declaratory judgment that CHEP, by insisting that it retains
ownership rights in all CHEP pallets, is in violation the Ohio Deceptive Trade
Practices Act, Ohio Rev. Code Chapter 4165 ("ODTPA"). Count Two is for a
declaratory judgment that the CHEP pallets which come into Buckeye's possession,
through the ordinary course of business, have either been lost or abandoned by
CHEP, on account of its inability to regulate the flow of such in the stream of
commerce, such that it no longer can claim legal title thereto. Count Three is for a
declaratory judgment that, to the extent CHEP retains an ownership interest in the
CHEP pallets within Buckeye's possession, Buckeye has a common law lien in such,
on account of its acts of sorting and safeguarding them, and returning them to the
stream of commerce. Count Four is for unspecified money damages and a
declaratory judgment that CHEP has been unjustly enriched by Buckeye's acts of
sorting and safeguarding its pallets, and returning them to the stream of commerce.
Count Five is a claim for tortious interference with Buckeye's business
relationships, stemming from CHEP's alleged communications to various entities
with which Buckeye does business, that it (CHEP) retains legal ownership of all
CHEP pallets within Buckeye's possession.

   For its part, CHEP has filed three counterclaims (see Doc. #2), for replevin,

2

conversion and a permanent injunction barring Buckeye from interfering with its

ownership and possessory rights in CHEP pallets, both now and in the future.

At issue are CHEP's Motion for Summary Judgment on Buckeye's Claims

(Doc. #27), Buckeye's Motion for Summary judgment on Count I of Its Complaint

(Doc. #30) and Buckeye's Motion for Summary Judgment on CHEP's counterclaims

(Doc. #29). For the reasons set forth herein, the Court will sustain in part and

overrule in part CHEP's Motion, and overrule both of Buckeye's Motions.[1]


I. Factual Background

The Court will set forth the uncontested facts. Below, when it considers the

parties' respective Motions for Summary Judgment, it will construe the disputed

facts in the light most favorable to the relevant non-moving party.


A.    The Flow of Pallets in the Stream of Commerce

Typically, as goods move in commerce from their manufacturers, to

distributors, to wholesalers, and finally to retailers, where they are made available

for purchase by the average consumer, wooden pallets are used for purposes of

hauling, loading and unloading, and storing the goods. As they make their way

through the various commercial trade points, excess pallets, no longer needed for

shipping, loading or storage purposes, are sold to pallet resellers or recyclers, or

---

[1]The Court will also note at the conclusion of this Decision and Entry several other
motions rendered moot by the herein decision.

returned to their original vendors. It is not uncommon for manufacturers to purchase pallets outright when they requisition such for their shipping needs. Therefore, a pallet's cost, and therefore its title, often passes along in the price of the good being shipped as it makes its way through the stream of commerce. CHEP, however, purports to be in the business of leasing its proprietary pallets, which are distinctively marked, in contrast to the bulk of pallets in commerce, which tend to be uniform in size and appearance.

B.    The Character of CHEP's Agreements with Its Customers

CHEP, which operates out of nearly 200 CHEP service centers across the United States, purports to lease its pallets, pursuant to its form "Rental Agreement." (See Rental Agreement, Norder Aff. at Ex. 1; Potts Aff. ¶6.)[2] All CHEP pallets are painted blue on their sides, are inscribed with CHEP's logo, and bear the company's toll-free telephone number and the words "PROPERTY OF CHEP." (Potts Aff. ¶¶5, 16 & Exs. 2, 4 & 8.) Pursuant to its Rental Agreement, CHEP purports to retain absolute ownership of all of its pallets at all times. (Norder Aff. ¶4; Potts Aff. ¶5; Rental Agreement ¶2.) The leasing process begins with CHEP entering into an agreement with a manufacturer of goods in need of pallets ("lessee"). (Norder Aff. ¶¶3-7; Rental Agreement.) In order to retain control and

---

[2]Keith Norder is the Senior Vice President and Chief Financial Officer for CHEP. His affidavit is attached to CHEP's Appendix to its Motion for Summary Judgment (Doc. #28). Elton Potts is the Vice President of Asset Management for CHEP. His affidavit is attached to CHEP's Appendix to its Motion for Summary Judgment (Doc. #28).

4

dominion over its pallets, CHEP also enters into pallet retention and return agreements with downstream commercial entities, such as distributors ("secondary customers").[3] (Rental Agreement ¶3; Norder Depo. at Ex. 133; Doc. #30 at Ex. I.) Before a lessee can ship its product on a CHEP pallet to a downstream entity, it must first get approval from CHEP, or must understand that the downstream entity is already a secondary customer of CHEP. (Rental Agreement ¶3.) CHEP charges its lessees a daily pallet rental fee on each CHEP pallet within their possession on any given day. (Id. ¶¶3 & 4.)[4] In this manner, CHEP has created a "leasing pool" of CHEP pallets, and it typically falls on the secondary customer, not the lessee, to return CHEP pallets to CHEP. (Potts Aff. ¶6; Norder Depo. at Ex. 133.)

### C.   CHEP's Notification to Non-Customers about Its Ownership Interest

In 1998, CHEP started allowing its lessees to ship their goods on CHEP pallets to downstream entities with *no contractual relationship with CHEP*. (Norder Aff. ¶9.) CHEP referred to this new policy as their Accelerated Volume Program, or AVP, which they initiated to accommodate their lessees' requests to use CHEP

---

[3]The term "secondary customer" is the Court's own, used for descriptive purposes.

[4]At any given time, if CHEP's pallet tracking information is accurate, outstanding pallets will be attributed to only one customer, be it a lessee or secondary customer. This is because the number of pallets attributable to a lessee on a given date is reduced by the number of pallets it transfers to a secondary customer. (Rental Agreement ¶3.) Likewise, the number of pallets attributed to the secondary customer is increased by that same number. (Id.) CHEP does not charge the secondary customers a rental fee, but it does keep track of the number of pallets in their possession, and charges them a "lost pallet" fee for any pallets not returned. (Norder Depo. at Ex. 133; Potts Depo. at 37.)

pallets to ship to all of their own downstream customers. (Southwick Depo. at 28,

30; Miller Depo. at 19.) CHEP refers to downstream entities with which it has no

contractual relations as non-participating distributors, or NPDs. (Norder Aff. ¶10;

Miller Depo. at 19.) The catch, as far as the lessee is concerned, is that CHEP

imposes a per pallet surcharge on each CHEP pallet used to ship goods to an NPD.

(Norder Aff. ¶10.) CHEP categorizes NPDs as cooperative or uncooperative (or

hostile) toward its efforts to recover its pallets. (Potts Depo. at 98; Southwick

Depo. at 36; Doc. #30 at Ex. O.) Where CHEP approves a lessee's use of CHEP

pallets to ship goods to a cooperative NPD, it imposes a surcharge of $3.50 per

pallet, but where it approves the use of CHEP pallets for shipping to uncooperative

NPDs, its surcharge is $8.00. (Potts Depo. at 78; Norder Depo. at 43.)

The immediate downside to the implementation of its AVP was that it found

it more difficult to recover its pallets from the stream of commerce. (Southwick

Depo. at 29; Doc. #30 at Ex. R.) CHEP estimates that its pallets have been

shipped to more than 20,000 NPDs. (Southwick Depo. at 53; Norder Depo. at

163.) CHEP attempts to control the outward flow of its pallets by requiring lessees

to obtain its approval before shipping goods to an NPD on CHEP pallets, which

includes their providing CHEP with information as to the name and address of the

NPD, the volume of CHEP pallets used, and the date of the shipment. (Norder Aff.

¶9; Rental Agreement ¶3.) CHEP makes a concerted effort to track the flow of its

pallets, and to notify all NPDs, and other downstream entities which come into

6

possession of its pallets, such as recyclers, of its continuing ownership interest in CHEP pallets. (Potts Aff. ¶¶12, 15 & Exs. 3, 4, 5, 6 & 8; Norder Aff. ¶¶9, 18 & Ex. 4; DeVaughn Depo. at 22.) It sends notices of its interest to such entities at least twice a year, along with company brochures describing its business model, and it provides a toll-free number for these entities to call to arrange for the collection of CHEP pallets. (Potts Aff. ¶¶18, 19 & 20; Norder Aff. ¶9 & Exs.)[5] CHEP also makes a concerted effort to visit the business sites of its secondary customers and NPDs, to monitor business practices concerning their management of CHEP pallets within their possession. (Southwick Depo. at 18, 27; Potts Aff. ¶17, 19 & 21; Norder Depo. at Ex. 133.) In visiting an NPD or other entity with which it does not have a contractual relationship, such as a recycler, like Buckeye, CHEP will make overtures to that entity to consider entering into an agreement with CHEP. (Potts Aff. ¶21.)

D.    CHEP's Ability to Account for CHEP Pallets

Inevitably, CHEP is unable to recover all of its pallets. Indeed, with respect to those pallets shipped to NPDs, it is unable to recover many of its pallets. (Doc. #30 at Exs. Q, R, S & T; Southwick Depo. at 29, 89, 105-107; Potts Depo. at 29, 67.) For example, between January of 1998 and July of 2002, CHEP was only able to recover about 35% of the over one million CHEP pallets used to ship goods

---

[5]These notices are in addition to the fact that all CHEP pallets expressly state on their exposed exterior that they are the property of CHEP.

to NPDs in Ohio. (Doc. #30 at Ex. S.) Its Vice President of Asset Management,
Elton Potts, acknowledged that in its best month, CHEP can only expect to recover
60-65% of its pallets which have been used to ship goods to NPDs. (Potts Depo.
at 67.) In a 2002 survey, CHEP realized that over 9 million of the approximately
67 million CHEP pallets in circulation were in the hands of NPDs. (Doc. #30 at Ex.
T; Southwick Depo. at 89; Norder Aff. ¶4; Norder Depo. at 215-217; Potts Depo.
at 29.) Moreover, an independent analysis performed in 2001 indicated that about
half of all CHEP pallets presumably in the possession of NPDs could not be
accounted for at all. (Doc. #30 at Ex. U, at Bates # CHEP06960; Southwick Depo.
at 76-77.) This is because CHEP has no way of tracking its pallets in the event an
NPD decides not to cooperate with its tracking or collection efforts. (Southwick
Depo. at 59.)

Given this reality, CHEP has found itself in the position of writing off a
significant number of its pallets for accounting purposes. (Norder Aff. ¶20; Norder
Depo. at 153-154 & Ex. 42; Potts Depo. at 63-64.) This was not unexpected:
CHEP realized at the time it implemented the AVP that it would be unable to
recover a significant number of CHEP pallets used to ship goods to uncooperative
NPDs. (Doc. #30 at Ex. Q; Southwick Depo. at 29.) In fact, the company's target
rate of pallet recovery from NPDs is only 80% (a goal it has never met). (Potts
Depo. at 66-67.) In 2002, attributing their loss to shipments to NPDs, CHEP wrote
off close to 3.5 million pallets for the fiscal year 2001, which it calculated to be

8

about 47% of the total pallets shipped to NPDs in 2001. (Norder Depo. at 155 & Ex. 42; Potts Depo. at 63-64; Doc. #30 at Ex. R.)  The average value of the CHEP pallets which it writes off (i.e., "book value") is about $6.30. (Norder Depo. at 157.)

### E.    CHEP's Relationship with Buckeye and Other Recyclers

Buckeye is in the business of used-pallet collection, recycling, repair or destruction, and reselling.  It makes an effort to avoid collecting CHEP pallets, but inevitably comes into possession of them on occasion by virtue of its service of collecting unsorted used pallets, in bulk, from various commercial sites where they tend to accumulate, such as those of distributors and wholesalers, which do not have agreements with CHEP.  (McAdow, Sr., Aff. ¶¶2, 5-7; McAdow, Jr., Depo. at 45-47, 59, 69-70.)[6]  Importantly, Buckeye never purchases CHEP pallets, even where included in its bulk collections; such pallets are not included in the negotiated purchase price.  (McAdow, Jr., Depo. at 54; McAdow, Sr., Depo. at 78.)  If it happens to pick up CHEP pallets in a bulk collection, Buckeye sets CHEP pallets aside at its depot.  (McAdow, Sr., Depo. at 90.)  Buckeye does not intentionally destroy or repair CHEP pallets.  (Id. at 90-91.)  The only revenue it generates on account of the CHEP pallets is that which it receives when it

---

[6]Sam McAdow, Sr., is the Chairman of Buckeye.  (McAdow, Sr., Aff. ¶1.)  A copy of his affidavit was included in CHEP's Appendix to its Motion for Summary Judgment.  Sam McAdow, Jr., is Buckeye's CEO.  (McAdow, Jr., Depo. at 8.)

transports CHEP pallets from one CHEP customer to another, and for shipping

certain CHEP pallets stored at its depot to customers in need of same, per the

terms of their own contractual obligations to CHEP. (McAdow, Jr., Depo. at 91-

92; McAdow, Sr., at 90, 172; Minner Depo. at 49.)

CHEP does not object to Buckeye serving as a disinterested courier of CHEP

pallets from one CHEP customer to another (Def.'s Memo. in Opp. to Pl.'s M.S.J.

on Count I of Compl. (Doc. #36) at 15), but it does object to Buckeye delivering the

CHEP pallets stored at its depot to CHEP customers in need of same, because it

does not believe Buckeye has a right to store the pallets in the first instance; it

insists they must be returned to CHEP upon its demand. (Id.)

The pallet recycling business posed a problem to CHEP after the initiation of

its AVP. (Potts Aff. ¶13.) CHEP is unable to track the flow of its pallets from

NPDs to recyclers (Fisher Depo. at 136; Southwick Depo. at 58), and as with

NPDs, CHEP has no pre-existing contractual means of enforcing its claim of

ownership over CHEP pallets once such pallets came into the possession of

recyclers.[7] On occasion, CHEP has resorted to civil actions, for replevin and the

like, and has even pressed criminal charges, to recover its pallets. (Norder Aff.

¶14; Def.'s Reply (Doc. #41) at attachments; Doc. #30 at Ex. AA.) At some point,

CHEP realized that it made better business sense to negotiate with recyclers, and to

---

[7]CHEP estimates that there are over 4,000 pallet recyclers operating in the United
States, and that these entities will often come into possession of CHEP pallets in their normal
course of business. (Potts Aff. ¶13.)

compensate them for their collection and return of CHEP pallets.  (Norder Aff.

¶¶15, 16.)  After slow acceptance from the recycling industry, in 2001, in a

greater effort to stanch the outward flow of CHEP pallets from its control, it

developed what it called its Asset Recovery Program ("ARP").  (Id. ¶¶17, 18 &

Exs. 4 & 8.)  Pursuant to its ARP, CHEP notifies recyclers of its claim of ownership

respecting all CHEP pallets, and offers to compensate them for the return of same

per fixed terms.  (Potts Aff. ¶21; Norder Aff. ¶18 & Ex. 4.)  CHEP offers recyclers

$2.00 per pallet for all pallets shipped over 200 miles to a CHEP collection depot,

$1.50 for all pallets shipped under 200 miles to a CHEP collection depot, and 50

cents per pallet for all pallets made available for pick-up by CHEP.  (Norder Aff. ¶18

& Ex. 4.)  Recyclers who accede to its terms also agree to settle all legal disputes

in the Florida State courts, pursuant to the laws of the State of Florida.  (Id. at Ex.

4.)

Approximately 750 recyclers have joined CHEP's ARP.  (Norder Aff. ¶19.)

Buckeye, which asserts that other proprietary pallet vendors pay upwards of $5.00

per returned pallet, does not consider CHEP's terms to be fair, and has never

entered into an agreement with CHEP.  (McAdow, Sr., Aff. ¶6; McAdow, Jr.,

Depo. at 70.)  This action was spurred by CHEP's continual assertions to Buckeye

and others that it retains all rights of ownership in any and all its pallets that have

or might come within their possession.  (Doc. #30 at Exs. I & Z.)

II. Standards Governing Motions for Summary Judgment

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995). Read together, Liberty Lobby and Celotex stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be

12

able to produce sufficient evidence at trial to withstand a directed verdict motion
(now known as a motion for judgment as a matter of law, Fed. R. Civ. P. 50).
Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989).

Once the burden of production has so shifted, the party opposing summary
judgment cannot rest on its pleadings or merely reassert its previous allegations. It
is not sufficient to "simply show that there is some metaphysical doubt as to the
material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
586 (1986); see also Michigan Protection and Advocacy Serv., Inc. v. Babin, 18
F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of
evidence in support of his position; the evidence must be such that a jury could
reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving
party to go beyond the [unverified] pleadings" and present some type of evidentiary
material in support of its position. Celotex Corp., 477 U.S. at 324. Summary
judgment "shall be rendered forthwith if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show
there is no genuine issue as to any material fact and that the moving party is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary
judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can
be resolved only by a finder of fact because they may reasonably be resolved in
favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992)
(citation omitted). Of course, in determining whether a genuine issue of material

fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also L.S. Heath & Son, Inc. v. AT&T Information Sys., Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir.), cert. denied, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ..."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

14

III. Analysis

The Court will address CHEP's Motion for Summary Judgment first, construing the facts and all reasonable inferences which can be drawn therefrom in a light most favorable to Buckeye. The claims raised by Buckeye present alternative theories of relief. Counts One, Two and Five contemplate legal relief premised on a finding that, by one means or another, CHEP is no longer the owner of the CHEP pallets over which Buckeye has claimed dominion (or those over which it will claim dominion in the future), and that it is therefore liable for making representations to Buckeye's business partners, or potential business partners, that it does retain ownership over all CHEP pallets. Counts Three and Four contemplate equitable relief, premised on a finding that to the extent CHEP possesses legal title to said pallets, Buckeye has an equitable interest therein for which it deserves to be compensated, if required to relinquish possession to CHEP. The Court will address the legal claims first.

    A.    <u>CHEP's Motion for Summary Judgment (Doc. #27): the Legal Claims -
Counts One, Two & Five</u>

At the heart of Counts One, Two and Five is Buckeye's claim that CHEP has no legal right of ownership over the CHEP pallets in Buckeye's possession.[8]

_____

[8]Buckeye has not stated an independent declaratory judgment action, pursuant to Ohio Rev. Code §2721.02(A), which grants a party the right to seek a declaration of his "rights, status, and other legal relations whether or not further relief is or could be claimed." Coshocton Real Estate Co. v. Smith, 67 N.E.2d 904, 905 (Ohio 1946) (recognizing that a declaratory judgment is the proper remedy where "a judgment or decree will terminate the

Moreover, with respect to Count Five, ownership is but one of the elements of the claim: even if the Court were to agree with Buckeye that CHEP does not retain ownership over the CHEP pallets at issue, it would have to proceed to determine whether CHEP has engaged in activity constituting tortious interference with a business relationship. The Court will address this aspect of Count Five before addressing the question of ownership generally.

###### 1.    CHEP's Conduct Irrespective of Ownership of CHEP Pallets

Count Five cannot survive summary judgment. In Ohio, in order to make out a claim for tortious interference with a business relationship, a plaintiff must demonstrate (1) the existence of a business relationship, or prospective business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; (4) lack of privilege; and (5) damages resulting therefrom. Fred Siegel Co., L.P.A. v. Arter & Hadden, 707 N.E.2d 853, 858 (Ohio 1999); Barilla v. Patella, 760 N.E.2d 898, 904 (Ohio Ct. App. 2001) (8th Dist.); Super Sulky, Inc. v. United States Trotting Ass'n., 174 F.3d 733, 741 (6th Cir.), cert. denied, 528 U.S. 871 (1999).

Only improper interference is actionable. A finding of interference alone does not give rise to liability, as such a finding does not imply that the action was inherently improper. See Siegel, 707 N.E.2d at 858. It is the "lack of justification"

---

controversy or remove an uncertainty"). However, it has incorporated this remedy by express reference into Counts One, Two, Three and Four.

factor, or "absence of privilege" factor, that goes to the question of whether an act of interference was improper. See id. Restatement (Second) of Torts §767 (1979), adopted by the Ohio Supreme Court in Siegel, provides guidance for determining whether interference with a business relationship or a prospective relationship is improper. It enumerates several factors to consider, those being: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

CHEP was privileged to assert its purported ownership right in CHEP pallets. As the Court noted in its decision overruling Plaintiff's Motion to Remand (Doc. #7), the essence of this dispute is like that of a quiet title action. (Doc. #14 at 9.) Barring a pre-existing decree of ownership, or the like, the fact that one party to a title dispute ultimately ends up on the losing side of the argument does not make its assertion of ownership on the front end tortious. Herein, the facts readily demonstrate that whatever the merits to its claim of ownership, CHEP certainly had a good faith belief that it retained, or should be recognized under the law as having retained, ownership of CHEP pallets that had passed beyond its direct control in the stream of commerce. Indeed, it has submitted into the record orders from two other courts, in which its ownership interest in all CHEP pallets has been

recognized, and its lease agreements deemed valid. (Doc. #41 at attachments.)[9] This evidence, along with the plethora of evidence demonstrating its intent not to relinquish ownership at any time over any of its pallets, and the absence of any facts demonstrating that CHEP knew, or had reason to know, that its claims of ownership were frivolous, as a matter of law, necessitates a finding that CHEP's claims of ownership to Buckeye and others were privileged, regardless of whether they were correct as a matter of law.

To hold otherwise would be to suggest that a party desirous of asserting a claim of ownership must first seek an in rem judicial declaration as to the ownership of the res in question, even before any cognizable case or controversy has ripened, lest it be charged at some subsequent point with tortiously interfering with another's contracts or business relationships. The law in Ohio does not require a party to take such an action.[10] Accordingly, regardless of how the Court

---

[9]The first order attached issued from the Superior Court of the State of Arizona in the County of Maricopa, captioned Order of Permanent Injunction and Stipulated Order, filed Dec. 21, 2000 (enjoining Southwest Forest Products, Inc., a pallet recycler, from destroying, altering or withholding from CHEP any CHEP pallets which come into its possession). The second order attached issued from the United States District Court for the Eastern District of Virginia, captioned Consent Decree, filed February 5, 2003 (enjoining American Pallet, Inc., from destroying, altering, selling or withholding CHEP pallets from CHEP).

[10]Buckeye's fifth claim has much in common with a claim of defamation. Not only is it challenging the merits of CHEP's underlying statement, i.e., that it retains legal title in all CHEP pallets, but its legal right to assert the underlying statement. It seems plain that as long as an expressed claim of ownership is rational, it cannot be tortious. Rule 11 protects against frivolous claims and defenses asserted in court, but in any event, the facts simply do not demonstrate that CHEP believed its claims to be false; indeed, they demonstrate just the opposite. Absent such known falsity, whether CHEP's understanding of its legal rights was correct is immaterial. (Of course, a ruling by this Court finding Buckeye the true owner of the pallets in question would bar CHEP from claiming ownership in its future practices, except to the extent it would do so pursuant to an appeal to the Court of Appeals.)

would decide the question of ownership, an action will not lie for tortious

interference with a business relationship. Accordingly, as to Count Five, CHEP's

Motion for Summary Judgment is SUSTAINED.


### 2.    Ownership of the CHEP Pallets in Dispute

The evidence demonstrates without question that CHEP has at all times

retained ownership in its pallets. For that reason, Counts One and Two are without

merit, and summary judgment must be granted with respect thereto. (This finding

also serves as a second basis for finding that summary judgment is warranted with

respect to Count Five.)

With respect to Count One, the ODTPA, Ohio Rev. Code §4165.02, states in

relevant part:

> (A) A person engages in a deceptive trade practice when, in the course
> of the person's business, vocation, or occupation, the person does any
> of the following:
> (1) Passes off goods or services as those of another;
> (2) Causes likelihood of confusion or misunderstanding as to the
> source, sponsorship, approval, or certification of goods or services;
> * * *
> 10) Disparages the goods, services, or business of another by false
> representation of fact.

In arguing that CHEP violated these three provisions of the ODTPA by asserting to

it and others in the pallet industry that it retained ownership over all CHEP pallets at

all times, Buckeye's primary contention is that CHEP's agreements with its

manufacturers (lessees) were not leases at all, but sales. It makes much of the fact

19

that the manufacturers bear no responsibility for returning CHEP pallets to CHEP, while the entirety, or significant portion, of the burden falls on distributors. According to Buckeye, because manufacturers have no duty to return CHEP pallets, their agreements with CHEP cannot constitute lease agreements as defined in Ohio Rev. Code 1310.01. Its argument is not well taken.

Before considering what a "lease" is in Ohio, the Court will note as an initial matter that Buckeye has not pointed to any fact in the record demonstrating that manufacturers bear no responsibility for returning CHEP pallets to CHEP. In fact, per the terms of the Rental Agreement, it would seem that they do bear such a responsibility. (Rental Agreement ¶6; Potts Depo. at 40.) As a practical matter, however, it makes sense that in most situations, a distributor or some other secondary customer will actually be tasked with the responsibility of returning the pallets, given the realities of commerce, notably the fact that manufacturers represent a point of departure for goods. Because it won't typically accumulate the pallets which it has requisitioned for the specific purpose of outbound shipping, a manufacturer, being the lessee of CHEP pallets, in effect will have nothing in its physical possession to return to CHEP. For the reasons which follow, the Court does not find this fact inconsistent with the notion that its agreement with CHEP is a lease agreement.

"Lease" is defined as "a transfer of the right to possession and use of goods for a term in return for consideration." Ohio Rev. Code §1310.01(10). As a

20

general proposition, parties to an arm's length business transaction should be entitled to structure an agreement in any way they see fit, and as long as it is not illegal or unconscionable, it is not for a court to set aside. See, e.g., Deken v. MacGregor, 1991 WL 122910, at *5 (Ohio Ct. App. July 3, 1991) (9th Dist.).  On the other hand, it is also generally true that substance, not form, determines the character of an agreement. See Ohio Rev. Code §1301.01(KK)(2).  Thus, where a purported lessor gives a purported lessee the right to purchase the good at the conclusion of the lease term, for a nominal price, at which point in time the sum of the lease payments will have already covered the original selling price, and where the purported lessee has no right to terminate the lease agreement, the law will often treat the purported lease as a sale. See id.; e.g., Star Bank, N.A. v. Unruh, 1992 WL 131428, at *4 (Ohio Ct. App. 1992) (2 Dist.) (discussing distinction between a true lease and a sale with a retained security interest).

In this case, the Rental Agreement used by CHEP represents a true lease.  In exchange for the use of CHEP pallets to ship their goods, manufacturers agree to pay CHEP consideration in the form of rent for as long as CHEP pallets remain in their possession.  When an equal number of those pallets are returned to CHEP or recorded as having been transferred into the possession of a downstream entity, be it a secondary customer of CHEP or some other party, the manufacturers' lease terms are deemed complete.  Pursuant to the terms of the Rental Agreement, which CHEP's lessees, by all appearances, have entered into freely and willingly,

21

the lessees agree that the consideration they pay does not entitle them to title to the CHEP pallets. CHEP, in turn, assumes the risk of recovering its pallets from its secondary customers and other downstream entities which come into possession of its pallets. Buckeye has not pointed to any legal authority demonstrating that such an agreement cannot be characterized as a lease.

The common law doctrine of mutuum is of no help to Buckeye, though the Court does not find Buckeye's invocation of this doctrine as irrational as CHEP would make it out to be. This doctrine is a true product of the common law, dating back to Roman civil law. See Rozsa v. May Davis Group, Inc., 152 F. Supp. 2d 526, 532 (S.D.N.Y. 2001); Webster's Third Int'l Dictionary 1493 (1976). At common law, a mutuum was to be distinguished from a regular deposit, or bailment of goods. In the case of the latter, the bailee obtained possession of a specifically identified good, belonging to the bailor, to use for an agreed upon purpose, and as long as the bailee performed without negligence according to the terms of the agreement (contract of bailment), the bailor remained at risk for any unforeseen damage to the good in question (the bailed good). See, e.g., David v. Lose, 218 N.E.2d 442, 444 (Ohio 1966) ("The bailee for hire is obligated by law to exercise ordinary care in the safekeeping of the bailor's property...."); Chase v. Washburn, 1 Ohio St. 244, 247 & 249 (Ohio 1853). On the other hand, a mutuum applied to the deposit of fungible items, and existed where the bailee was not obligated to return a specified item deposited with him, but, rather, merely a like item. See

22

Chase, 1 Ohio St. at 247. In such a case, "the absolute property passed to the mutuary [i.e., the person with whom the item was deposited], it being a delivery to him for consumption or appropriation to his own use; he being bound to restore not the same thing, but other things of the same kind."  Id.  "Thus, it is held that if corn, wine, money, or any other thing which is not intended to be delivered back, but only an equivalent in kind, be lost or destroyed by accident, it is the loss of the borrower or mutuary; for it is his property, inasmuch as he received it for his own consumption or use, on condition that he restore the equivalent in kind."  (Id.) (emphasis added).  In Chase, quoting Justice Story's treatise on bailments, the Ohio Supreme Court noted that a mutuum amounts to a debt certain; the person receiving the item takes title thereto, and owes its equivalent to the person delivering it. Id. at 249.

Buckeye argues that the doctrine of mutuum applies to the agreements between CHEP and its lessees. It contends that this is so because lessees and other secondary customers have no obligation to return specific CHEP pallets, only CHEP pallets generally, which are more or less identical in appearance.[11]  Buckeye's argument presents an interesting question, but ultimately the Court does not agree with its premise.

In Chase, Washburn gave Chase a deposit of wheat with the intent that Chase would repay the same in kind upon Washburn's demand.  1 Ohio St. at 244-

---

[11]CHEP makes two different styles of pallets (see Kirk Depo. at 13), but as to each style, the pallets are identical.

45. Prior to Washburn's return, Chase's warehouse burned to the ground, consuming all the wheat within, by no fault of Chase. Id. at 245, 247. Chase sought to relieve himself of any debt to Washburn, on the basis that he had ample wheat in his warehouse at the time of the fire to repay Washburn, but that Washburn had failed to make a demand for the wheat due him prior to its destruction in the fire, thereby erasing his debt of repayment. Id. at 246. Invoking the doctrine of mutuum, the Ohio Supreme Court held that the transaction was tantamount to a sale, such that Chase owed Washburn a debt (i.e., return consideration), which could not be erased merely because the originally deposited good creating the debt was no longer in existence. Id. at 247-52.

A case more akin to the facts herein was Carpenter v. Griffin & Spencer, 9 Paige Ch. 310 (N.Y.Ch. 1841). In that case, before the Chancery Court of New York,[12] Fowler "leased" to Spencer a farm, replete with the sheep and cows then on it, for five years, in exchange for an annual rent of $350, and Spencer's agreement to return the farm at the end of five years with like cows and sheep (but not the same cows and sheep). Halfway through the lease term, Fowler sold his farm to Carpenter. In the meantime, Spencer sold some of the original sheep and cows, and used the proceeds to acquire more cows. Subsequently, but prior to the end of the five-year lease term, Griffin, a creditor of Spencer, levied all of Spencer's cows. Carpenter sought to enjoin Griffin from selling or removing the animals on

---

[12]New York's Chancery Court was the highest court of equity in that state prior to 1848.

the farm, claiming a specific lien thereon, owing to the terms of the lease agreement between Fowler and Spencer. The Chancery Court held that the delivery of the animals as part of the lease of the farm constituted a mutuum, such that Carpenter, as Fowler's successor in interest, did not acquire an equitable lien in the cows levied on by Griffin, by virtue of their being purchased with the proceeds from the sale of the original cows and sheep. (The terms of the original lease also left Carpenter without a security interest in the replacement sheep.) Carpenter was entitled to no more than a repayment of like cows and sheep at the conclusion of the lease term, which had not yet occurred.

As thoughtful as it is, Buckeye's reliance upon the doctrine of mutuum is to no avail in this case. The fundamental difference between the facts of this case and the facts of those cases discussing mutua is that here, the goods in dispute are not "consumed" or "appropriated," they are only being used. Putting aside for the moment the fact that a certain number of CHEP pallets fall into the hands of entities having no contractual relationship with CHEP, the CHEP pallet system is a closed system (at least in theory). Although individual CHEP pallets may be fungible within the closed CHEP pallet pool, the pallets are not consumed. If the system works, the only "consumption" of pallets would be due to structural damage and the like. This is significantly different than the consumption of farm products, wine, or other commodities. Even if the identical pallet leased to the lessee does not need to be returned to satisfy the terms of the Rental Agreement

as to that particular pallet, at some point it will be returned, and CHEP does not give up its claim to that particular pallet while it is out of its possession or control.

Thus, it would be as if Fowler, the lessor in Carpenter, had leased a team of mules to Spencer, the lessee, not to be consumed, but perhaps as beasts of burden, with the agreement that the mules were to be returned at the conclusion of their use, and that he would charge a rental fee on each for every day they were in Spencer's possession.  Using terms such as those set out by CHEP in its Rental Agreement, Fowler might have leased Spencer 100 mules, each branded with his mark, with the agreement that those mules would be used to pack goods for delivery to a third party, in the next town over.  Fowler could have also agreed to cease charging his rental fee upon delivery of the mules to the third party, and separately contracted with the third party for the return of same.  If, to make the hypothetical more like the facts at issue herein, Fowler had similar agreements with 99 other lessees, all of whom regularly delivered their goods to common third parties, Fowler might have stipulated with those third parties that they were not obligated to return any particular mule on any given occasion in order to satisfy their return obligation, only a mule branded with Fowler's mark.  Thus, Fowler would have created a pool of 1000 leased mules, constantly in circulation, constantly in flux, but at all times, he would have retained ownership.  The Court has found no legal authority, and Plaintiff has cited none, declaring that a party such as Fowler could not "lease" his mules in such fashion.

26

The fact that CHEP's lessees (goods manufacturers) do not (generally) bear the burden of returning the CHEP pallets is irrelevant. Business models have to adapt to business realities, and a court of law should not apply a rule dating back to Ancient Rome to hamper contemporary business practices. Pallets move with the goods on which they are shipped. In the run of situations, it would be impracticable for CHEP's lessees to return the very CHEP pallets which they have used to ship their manufactured goods to downstream entities. It would create huge inefficiencies to require shipments to be transferred on to new pallets at every trade point so that the original pallet could be returned with the shipper (which would be, practically speaking, the necessary end result were Buckeye's argument to be accepted.) Instead, what CHEP's business model proposes is that distributors, i.e., CHEP's secondary customers, bear responsibility for the return of the CHEP pallets, <u>once emptied</u> in the normal course of unloading the goods downstream, at a wholesaler's or retailer's warehouse. In such fashion, CHEP's secondary customers become the acting repositories for CHEP pallets leased to its manufacturer customers. In turn, in calculating rental charges, CHEP invoices a lessee based on the number of outstanding pallets attributable to it on any given date, and then looks to its secondary customer to return the leased pallets.

If CHEP's pallet tracking is faulty, such that it overcharges a lessee or erroneously charges a secondary customer a "lost pallet" fee, that is an issue for its lessees and secondary customers to raise with CHEP directly, but the Court

perceives no inherent legal shortcoming to characterizing its agreements with the individual players in its closed pallet distribution system as lease agreements,[13] and there is nothing in lease law that requires a leased item to be returned directly to the lessor after its use.  It is the lessor's prerogative to dictate how such is to be accomplished.

The question, then, is what legal effect, if any, arises when the erstwhile closed pallet distribution system is opened, and pallets make their way into the hands of entities with no contractual relationship with CHEP.  The Court believes that the opening of a system does not change the inherent nature of CHEP's relationships with those with which it has contractual agreements.  The fact that some, or even many, of its pallets may make their way to other parties does not alter the terms to which the contracted lessees agreed.  As for those entities with which CHEP has no agreement, ownership of CHEP pallets must be determined per the rules set forth in the Uniform Commercial Code ("UCC"), Ohio Rev. Code Chapters 1301-1310, and/or the common law of personal property.  Thus, whether an NPD, or another party with which CHEP has no agreement, such as Buckeye, might become the owner of CHEP pallets, turns on whether that party is a good faith purchaser for value or a buyer in the ordinary course of business, or whether it has acquired CHEP pallets pursuant to the doctrines of gift, loss or abandonment.

---

[13]While it has not been necessary to entertain evidence on such leasing pool systems in general, the Court imagines that similar arrangements might exist with respect to other instruments of commercial shipping, such as railroad box cars and maritime shipping containers.  Certainly, title need not pass, as a matter of law, at every point of exchange.

The Court will discuss these concepts in turn, but first will address one final matter regarding the doctrine of mutuum.

In the Court's opinion, the only potential glitch in CHEP's claiming absolute ownership over all of its pallets is the "Lost Equipment" clause in its Rental Agreement.  That clause appears to make the lessee liable for any destroyed, lost or stolen pallet, regardless of fault.  This is contrary to the common law, where the general rule was that a bailee would not be held liable for the destruction or theft of a bailed item unless it caused that destruction or theft.  See Chase, supra.  This rule applied to lease agreements, given that leases were merely a special form of bailments.  See Walton Commercial Enterprises, Inc. v. Associations, Conventions, Tradeshows, Inc., 593 N.E.2d 64, 67 (Ohio Ct. App. 1990) (10th Dist.) ("A lease for personal property is merely an agreement creating a common-law bailment for hire that mutually benefits both parties. Consequently, common-law principles of bailment apply.")  Absolute liability would be that of the bailee, or lessee, only if, in legal effect, that entity were deemed the actual owner of the item.  By the terms of its "Lost Equipment" clause, CHEP appears to be asserting its right to collect its "debt" from the lessee regardless of the fact that the lessees would not have been legally liable, at common law, for damages to, or theft of, the leased property, unless such damage or theft was proximately caused by their own negligence.

In the Court's opinion, the "Lost Equipment" clause, though perhaps assigning liability inconsistent with the rule at common law, does not evidence an

29

intent to sell, rather than lease, CHEP pallets. Again, the Court is not at liberty to question the merits of an arm's length transaction, and as long as CHEP's lessees are amenable to being held liable for any loss, damage or theft of CHEP pallets, regardless of fault, that is their prerogative.

Turning to whether CHEP has given up ownership of those pallets which have fallen into the hands of downstream entities with which they do not have contractual relations, the Court will first consider the question of property ownership under the UCC. An individual might acquire good title to a good, notwithstanding the seller's lack of title to give, if he is a "good faith purchaser for value." Ohio Rev. Code §1302.44(A). "Good faith" means honesty in fact. Id. §1301.01(S). For a number of reasons, downstream entities cannot claim they are good faith purchasers for value of CHEP pallets, at least not any of those identified by the parties herein. First, §1302.44(A) only applies where the seller obtained possession of the good for itself pursuant to a purchase transaction. See Creggin Group, Ltd. v. Crown Diversified Indus. Corp., 682 N.E.2d 692, 696 (Ohio Ct. App. 1996) (12th Dist.). Because CHEP's manufacturer-customers and secondary customers do not, by contract, purchase CHEP pallets, they cannot sell CHEP pallets to entities downstream from them. Second, given the multitude of notices issued by CHEP to any number of parties in the pallet industry, and the notice "PROPERTY OF CHEP," inscribed on the face of all CHEP pallets, no downstream entity could claim it was purchasing CHEP pallets in "good faith." Third, even if the

30

sellers from which Buckeye purchases pallets could give title free and clear to
Buckeye, Buckeye does not purchase CHEP pallets, so it cannot qualify as a
purchaser in any event. (McAdow, Jr., Depo. at 54; McAdow, Sr., Depo. at 78.)

Buckeye also does not qualify as a "buyer in the ordinary course of
business," because that concept, too, would require Buckeye to have purchased
CHEP pallets in "good faith" and "without knowledge" of CHEP's ownership rights.
Ohio Rev. Code §§1310.01(A) & 1310.33. The facts adduced by both parties
make it plain that neither the NPDs identified herein by Buckeye nor Buckeye itself
qualify as such, because CHEP, both in the labeling of its pallets and through
regular mailings, telephone calls and visitations to these entities, stresses without
ambiguity that it is the owner of all CHEP pallets.

The Court also disagrees with Buckeye that title passes in CHEP pallets in
the form of a "gift" whenever they are delivered to NPDs, thereby enabling Buckeye
to acquire CHEP pallets from said NPDs without the cloud created by CHEP's claim
of ownership. See Ohio Rev. Code §1333.60. A "gift" is created where a seller
delivers "merchandise" to a buyer who has not requested any such item. See id.
The Court doubts that "merchandise" in this context, though not defined in Chapter
1333, or anywhere else in the UCC, includes the pallets on which goods are
shipped. In any event, to the extent "merchandise" does include the pallets on
which requested goods are shipped (and Buckeye makes no argument that CHEP's
lessees regularly ship goods to distributors who have not requested such), then it

31

only makes sense that they, too, must be deemed "requested," rendering

§1333.60 inapplicable.  More importantly, because an entity can only give as a gift

that which it owns, see Ohio Rev. Code §1302.44; Advanced Dirt Works, Inc. v.

C.L. Bridges Equipment Co., 1998 WL 151102, at **3-5 (Ohio Ct. App. April 3,

1998) (2nd Dist.); Creggin, 682 N.E.2d at 696, and because CHEP's lessees, per

the terms of the CHEP Rental Agreement, do not own CHEP pallets, they cannot

turn around and gift them to third parties.

The loss and abandonment doctrines are the source of Count Two of

Buckeye's Complaint.  Neither doctrine is applicable to the facts of this case.

Whether a party abandons something it owns is a question of fact, turning on the

owner's intent, which "may be inferred from words spoken, acts done, and other

objective facts."  See State v. Thomas, 2002 WL 449668, at *5 (Ohio Ct. App.

March 14, 2002) (8th Dist.) (citing United States v. Cowan, 396 F.2d 83, 87 (2nd

Cir. 1968)); Gordon v. Morris, 2001 WL 85797, at *4 (Ohio Ct. App. Feb. 2,

2001) (2nd Dist.); Hamilton v. Harville, 577 N.E.2d 1125, 1126-27 (Ohio Ct. App.

1989) (12th Dist.).  As the facts adduced by the parties here make abundantly

clear, CHEP exerts a significant amount of effort in an attempt to recover the CHEP

pallets that have fallen into the hands of entities with which it does not have

contractual agreements.  This, Buckeye asserts, is not enough.  (See Pl.'s Memo. in

Opp. (Doc. #40) at 37.)  According to Buckeye, CHEP has so failed in its efforts to

police its pallet supply that it gives rise to a genuine issue of material fact as to

32

whether CHEP's assertion that it has never intended to abandon its property is believable. The Court disagrees. CHEP's success rate in recovering its pallets is immaterial. The fact of the matter is, it has always expressed an unambiguous intent to retain ownership of its pallets. That is the linchpin of the abandonment doctrine, not whether it has successfully advanced its claims of ownership among entities with which it has no contractual relationships.

Buckeye's comparison of CHEP's business practice to a person claiming continued ownership over a watch notwithstanding the fact that she has just thrown it over the side of a seafaring ship is colorful but not persuasive. (Id.) CHEP has not engaged in any equivalent act, demonstrating, in substance if not in words, an intent to abandon ownership of property. The facts demonstrate that while it allows its lessees to use CHEP pallets to ship its goods to NPDs and the like, it also requires its lessees to notify it of such, takes affirmative steps to contact NPDs, actively asserts its claim of ownership, and attempts to negotiate terms for the recovery of its pallets. This is far different than throwing a watch overboard. It is more akin to a situation in which X exchanges his expensive watch, noticeably inscribed with the words "X's watch," to his friend, Y, for a limited engagement and for a daily fee less than what it would cost Y to purchase a similar watch at retail, and then allows Y to lend it to another friend, Z, after which X contacts Z to negotiate the return of his watch. It may be that Z is reluctant to return the X's watch, lent to him by Y, but that does not make the watch, which Z

33

knows is the property of X, both by the inscription on the watch and the fact that X has given him notice that it is his watch, any less the property of X, however careless X might have been in allowing Y to lend the watch to Z. In this case, the abandonment doctrine does not aid in Buckeye's cause.

Regarding "lost property," such has been defined in Ohio as "property which the owner has involuntarily parted with through neglect, carelessness, or inadvertence, that is, property which the owner has unwittingly suffered to pass out of his possession and the whereabouts of which he has no knowledge." Ray v. Flower Hosp., 439 N.E.2d 942, 944 (Ohio Ct. App. 1981) (6th Dist.). This also does not capture the character of the CHEP pallets at issue. Buckeye points with some frequency to the percentage of pallets which CHEP must "write off" each year as "lost," but it has not demonstrated how this evidence is relevant to its claims.[14]

At issue are CHEP pallets which CHEP has reason to know are currently within the possession of Buckeye, and all CHEP pallets which might come into the possession of Buckeye at some point in the future. CHEP has not lost track of

---

[14]It is worth pointing out that Buckeye has not adduced any facts indicating that any other entity in the stream of commerce, itself included, claims CHEP pallets as company assets for accounting or tax reporting purposes. The fact that CHEP "writes off" a certain percentage of CHEP pallets each year, even a large percentage, only adds to the evidence that it, and not any other entity, considers itself, and intends to be regarded by others as, the owner of all CHEP pallets. E.g., In re Celeryvale Transport, Inc., 822 F.2d 16, 19 (6th Cir. 1987). Its business plan might not be efficient or even successful, but that does not mean it must relinquish its claim to CHEP pallets, which are painted in distinctive fashion and are inscribed with CHEP's logo, its toll-free telephone number, and the words "PROPERTY OF CHEP."

these particular pallets, and the facts demonstrate that it pays close attention to the activities of Buckeye as they concern those pallets. Whether certain other CHEP pallets floating around in the stream of commerce should be deemed lost is beside the point: those at issue are not lost; they have been identified at Buckeye's depot, CHEP knows where they are, and CHEP has attempted to recover them. It is counterintuitive to suggest that a company exerting an effort to recover its assets must cede those assets which it has in fact identified as existing outside its immediate control, on the basis that it allowed the assets to get out of its immediate control in the first place (and perhaps in other circumstances might not have been as successful in finding and identifying similar assets). That would be like denying an owner of a missing dog the right to retrieve his dog, once found and identified, on the basis that it was his fault for letting the dog get loose, by forgetting to close the gate to his yard.

Indeed, the rule in Ohio on lost property is to Buckeye's disadvantage in this regard, for it has been said that "when a person finds goods that have actually been lost, and takes possession with intent to appropriate them to his own use, really believing, at the time, or having good ground to believe, that the owner can be found, it is larceny." Brooks v. State, 35 Ohio St. 46, 49 (1878); Baker v. State, 29 Ohio St. 184, 185 (1876). Given the obvious identification of CHEP pallets on their face, CHEP's efforts to track the flow of its pallets (successful or not), and the amount of effort CHEP puts into notifying downstream entities such

35

as Buckeye that it desires and expects the return of its pallets, or at least that they

be made available for pick-up, Buckeye cannot claim that CHEP has allowed its

pallets to pass out of its possession, unwittingly, by neglect, carelessness or

inadvertence, or that it is not aware of the true owner of CHEP pallets once they

come within its possession.  To say that CHEP has lost its ownership rights in the

CHEP pallets in Buckeye's possession, despite the fact that they are clearly marked

and actively sought by CHEP, is like denying the dog owner the right to retrieve his

missing dog, or saying that a person who has lost his wallet has no right to claim it

even where his driver's license and/or other identifying instruments are contained

therein, he knows the person who is in possession of his wallet, and he has put

that person on notice that he would like to drop by his house to pick it up.

It is also inconsequential that CHEP imposes a surcharge on its lessees of

about $8.00 per pallet for pallets used to ship goods to uncooperative NPDs, while

the average book value of those pallets it writes off for accounting purposes is only

about $6.30, or that CHEP imposes a lost pallet fee on its secondary customers of

$5 or $24, depending on the overall percentage of pallets for which they cannot

account.  (See Norder Depo. at 157, 181 & Ex. 133.)  Buckeye's argument seems

to be that because CHEP charges a per pallet surcharge in excess of its per pallet

write-off value, it is masquerading a "sale" as a "lease."  (Doc. #30 at 13.)  It

applies the same logic with regard to the lost pallet fee: CHEP, it argues, cannot

very well charge a lost pallet fee of upwards of $24 and continue to maintain that it

36

has not lost its pallet and that it retains all ownership rights therein.  (Id.)

Buckeye's arguments on both points are without legal support.[15]

There is no correlation, or there need not be, between what CHEP charges its

lessees in the form of a surcharge for the use of its pallets, and the value it ascribes

to certain other pallets which its writes off for accounting and tax reporting

purposes.  The write-off value is based on the appraisal value of the oldest pallets

in CHEP's inventory (Norder Depo. at 157), and the Court fails to see the relevance

of that figure to this case.  Regarding the surcharge, presumably that is dictated to

a large extent by market forces.  Apparently, CHEP's lessees are satisfied with the

arrangement, or they would not agree to it.  If they thought it made better business

sense to purchase pallets outright from some other pallet vendor, then presumably

they would do so.[16]

Regarding the lost pallet fee, the fact that CHEP charges secondary

customers such a fee does not require it to give up its claim of ownership over the

lost pallet.  CHEP's two types of pallets cost about $16-19 and $17-22,

respectively.  (Kirk Depo. at 13.)  Buckeye has pointed to no provision in the law

that prevents CHEP from asserting its ownership right in a pallet for which it has

---

[15]The only legal support Buckeye cites is Rohrheimer v. Bryant, 3 Ohio Law Abs. 572 (Ohio Ct. App. 1925) (8th Dist.).  That case, involving a lease-end option to purchase real property, concerned the concept of accord and satisfaction.  The facts and relevant legal concepts discussed in that case were nothing like those in the case at bar.

[16]CHEP purports to make a stronger, more durable pallet than its competitors.  (Potts Aff. ¶5.)

already charged a "lost pallet" fee, even a fee that is greater than the retail market value of the CHEP pallet deemed lost, especially where it has expressly reserved its ownership interest therein, has not offered its lessee any option to purchase the pallet, exerts considerable effort to track down the pallet even after it has traveled outside its ken, and makes a credit adjustment, if feasible, where the "lost" pallet is subsequently found and returned to it. (Norder Aff. ¶11; Norder Depo. at Ex. 133.) Again, the Court must presume that the entities with which CHEP does business can make rational business decisions for themselves. If they find the terms unfair, it is their prerogative not to do business with CHEP.[17] More to the point, regardless of whether _any_ CHEP pallets should be considered lost, the ones at issue in this case, i.e., those within Buckeye's possession, are not.[18] CHEP knows where they are and has requested their return.[19]

---

[17]As an added observation, to the extent a claim might be stated that CHEP's "lost pallet" fee is usurious, or its business tactics coercive or otherwise illegal (which the Court is not suggesting), it is not a claim that Buckeye has standing to make, because Buckeye has no legal arrangement with CHEP.

[18]Even if Buckeye's legal argument on the issue of "loss" were correct, it has not pointed to any facts demonstrating that CHEP has collected a "lost pallet" fee for any of the CHEP pallets stored at its depot, or that these same pallets have been written off of CHEP's books. What it is seeking, therefore, is a declaration that _all_ CHEP pallets beyond its immediate control are lost or abandoned. That is far too broad a declaration to request. At the very least, it was incumbent upon Buckeye to adduce facts creating a genuine issue as to whether the CHEP pallets within its possession were lost or abandoned.

[19]As Buckeye points out, and as Ralph Buono, CHEP's Manager of Asset Protection, acknowledged, if a CHEP pallet is returned by an entity other than an existing customer, CHEP is unable to credit back any "lost pallet" fee previously charged, because it has no way of knowing which customer was originally charged with its loss. (Buono Depo. at 253.) This is irrelevant to Buckeye's claims. At best, the fact that CHEP collects a "lost pallet" fee would allow Buckeye to raise a defense to a claim for damages, were CHEP to claim that it has suffered damages on account of Buckeye's refusal to return a particular pallet. Even then, the

For all of these reasons, Count One, for violations of the ODTPA, and Count

Two, for a declaration that CHEP has lost or abandoned the CHEP pallets within

Buckeye's possession, are without merit, and as to them, CHEP's Motion for

Summary Judgment is SUSTAINED.

### B.   CHEP's Motion for Summary Judgment (Doc. #27): the Equitable Claims - Counts Three & Four

In Count Three, Buckeye seeks a declaratory judgment that, to the extent

CHEP retains an ownership interest in CHEP pallets within Buckeye's possession, it

has a common law lien in such on account of its acts of sorting and safeguarding

them at its depot.  Count Four is for unspecified money damages and a declaratory

judgment that CHEP has been unjustly enriched by Buckeye's acts of sorting and

safeguarding its pallets.  The Court will discuss these in turn.

It would be unprecedented for this Court to adopt Buckeye's argument that it

retains a common law artisan's lien on the CHEP pallets stored at its depot.  (See

Doc. #40 at 40-43.)  "An artisan, who furnishes materials or performs labor for the

repair of chattel property, has a common-law lien upon such chattel property for the

reasonable value of such labor and materials."  Cleveland Auto Top & Trimming Co.

---

defense would only be meritorious were Buckeye able to show that a particular CHEP pallet
within its possession was a pallet for which CHEP had collected a "lost pallet" fee, a factual
showing which it has not made.  It simply cannot be said, categorically speaking, that, as a
matter of law, CHEP has lost, abandoned or sold those CHEP pallets within Buckeye's
possession simply because CHEP's corporate records indicate that it loses control of a sizeable
number of pallets every year, that it regularly collects "lost pallet" fees, and that it does not
credit back such fees unless a specific customer returns a pallet formerly designated as lost.

v. American Finance Co. 177 N.E. 217, at syllabus (Ohio 1931). Buckeye points to

evidence indicating that CHEP recognizes the value that recyclers add to its

business by separating CHEP pallets from other pallets and returning them to CHEP.

(E.g., Russell Depo. at 82.) Indeed, CHEP's ARP itself is evidence of this fact.

That Buckeye adds value to CHEP's business, however, is something different than

it adding value to CHEP pallets. The former is properly raised pursuant to a

quantum meruit claim, which is the subject of Count Four; the latter is the subject

of Count Three, the basis for which is not supported by the facts of this case.

An artisan's lien will be recognized where a party bestows labor and skill "on

a chattel bailed to him for such purpose, and thereby improve[s] it." Shearer v. Bill

Garlic Motors, Inc., 394 N.E.2d 1014, 1015-16 (Ohio Ct. App. 1977) (6th Dist.).

A contract of bailment exists where the bailor delivers personal property to the

bailee, which is accepted by the bailee, and which the bailee intends to return to

the bailor. Kayanda v. Kamenir, 475 N.E.2d 519, 521 (Ohio Misc. 1984). Buckeye

is not a bailee, CHEP is not a bailor, and Buckeye neither received CHEP pallets

from CHEP pursuant to a contract of bailment, nor bestowed labor and skill on any

CHEP pallet, for any purpose agreed upon with CHEP. Furthermore, it has no intent

of voluntarily returning any such pallets. The facts demonstrate that Buckeye

merely separates and stores CHEP pallets at its depot, and will occasionally deliver

some of these pallets to CHEP lessees who are in need of such per the terms of

their Rental Agreement with CHEP. It has never repaired a CHEP pallet (McAdow,

40

Jr., Depo. at 88), and its other activities convey no benefit to CHEP pallets (which, as noted, is different than conveying a benefit to CHEP, as discussed below). Regarding their delivery of CHEP pallets to CHEP lessees, to the extent they collect a hauling or service fee, that itself is their remuneration. Regarding their continued storage of CHEP pallets at their depot, it cannot be said that they convey a benefit upon CHEP, for their actions are against CHEP's expressed wishes. As an additional matter, practically speaking, Buckeye has no choice, whether requested by CHEP or not, to sort CHEP pallets. After all, it considers them to have "negative value" (McAdow, Jr., Depo. at 54), so unless it would require the entities from which it collects its pallets in bulk to sort out CHEP pallets ahead of time, it is stuck with that task under its current business model. In Ohio, storage of an item alone is not enough to give rise to an artisan's lien, see Alcorn v. Moreland, 1989 WL 6166, at *2 (Ohio Ct. App. Jan. 30, 1989) (12th Dist.), and the Court imagines that this is especially true where the storage is not even made at the request of the owner.

Accordingly, there being no genuine issue of material fact on this claim (Count Three), as to it, CHEP's Motion for Summary Judgment is SUSTAINED.

Count Four, for unjust enrichment, presents another matter. Unjust enrichment, or quasi contract, means a contract implied in law, where none exists in fact. The relief available is based on equitable principles of the value of the plaintiff's performance, where it can show that (1) it conferred a benefit upon the

41

defendant, (2) the defendant knew of the benefit, and (3) the defendant would be
unjustly enriched to retain the benefit without compensating the plaintiff.  See
Hambleton v. R.G. Barry Corp., 465 N.E.2d 1298, 1302 (Ohio 1984).  As the
Court has already noted, Buckeye has no lien on the CHEP pallets; which is to say,
it has not added value to the CHEP pallets and does not have the right to withhold
their return to CHEP.  The CHEP pallets belong to CHEP, and they must be
returned.  It is not inconsistent, however, to find that Buckeye's actions of storing
CHEP pallets at its site have some value to CHEP.  Indeed, as noted, CHEP
acknowledges this fact, and demonstrates it by offering, pursuant to its ARP, to
compensate recyclers for returning CHEP pallets, or making same available for pick-
up by CHEP.  (Russell Depo. at 82; Norder Aff. at Ex. 4.)

At the end of the day, the concept of quasi contract is what this case is all
about.  CHEP and Buckeye have no formal agreement between them, and the
dispute is, at bottom, about the amount of compensation Buckeye deserves for
sorting and storing CHEP pallets, and returning them to CHEP.  The amount CHEP
considers Buckeye's services to be worth is documented by the standard offer it
makes to all recyclers.  (Norder Aff. ¶18 & Ex. 4.)  Buckeye values its services at
something more.  (McAdow, Sr., Aff. ¶6; McAdow, Jr., Depo. at 70.)  What is fair
and reasonable, which is to say, the value of Buckeye's services which the law
should imply in the absence of a contract in fact, turns on disputed questions of
material fact.  Thus, there being a genuine issue as to what is fair and reasonable

42

to both parties, CHEP is not entitled to summary judgment on this claim.[20]

Accordingly, as to Count Four, CHEP's Motion for Summary Judgment is

OVERRULED.


    C.    Buckeye's Motion for Summary Judgment on Count One (Doc. #30)

    Given the fact that summary judgment shall be granted to CHEP on Count

One of Buckeye's Complaint, Buckeye's own Motion as to this count must be

OVERRULED.


    D.    Buckeye's Motion for Summary Judgment on CHEP's Counterclaims
        (Doc. #29)

    Genuine issues of material fact exist with respect to CHEP's counterclaims

for replevin, conversion and a permanent injunction, necessitating the Court to deny

Buckeye's Motion for Summary Judgment as to same.

    Chapter 2737 of the Ohio Revised Code empowers this Court to order

Buckeye to allow CHEP to recover the CHEP pallets at its depot by action for

replevin. See Walther v. Central Trust Co., N.A., 590 N.E.2d 375, 378 (Ohio Ct.

App. 1990) (2 Dist.). Because the facts demonstrate that CHEP is, without

question, the owner of said pallets, and arguably has the right to immediate

---

[20]In actuality, Buckeye's unjust enrichment claim will not ripen until CHEP reaps the benefit of Buckeye's labor, which will not occur until the pallets at issue are again in its possession. Be that as it may, it would be illogical not to fix the terms of the "quasi contract" pursuant to this litigation, as part and parcel to the disposition of CHEP's counterclaims for replevin and conversion.

possession of same, Buckeye is not entitled to summary judgment on CHEP's replevin counterclaim.[21]  Accordingly, its Motion as to this counterclaim is OVERRULED.

With respect to CHEP's second counterclaim, Ohio courts have defined "conversion" as "the wrongful assuming of unauthorized control over the personal property of another, whether it is done purposefully or not." Fulks v. Fulks, 121 N.E.2d 180, 182 (Ohio Ct. App. 1953) (4th Dist.). "Intent or purpose to do a wrong is not a necessary element of proof to establish conversion," and "[t]he motive by which a party was controlled in the conversion of property is of no avail as a defense." Id. (citation omitted); see also Freeman v. Smith, 1991 WL 6271, at *6 (Ohio Ct. App. Jan. 7, 1991) (5th Dist.).  Given the discussion above about the ownership of the CHEP pallets in Buckeye's possession, Buckeye is not entitled to summary judgment on this counterclaim.  Accordingly, its Motion as to this counterclaim is OVERRULED.

Finally, with respect to CHEP's counterclaim for an injunction, which would, if well taken, require Buckeye to notify CHEP in any future instance when CHEP pallets come into its possession, the Court agrees with CHEP that Buckeye is not

---

[21]Buckeye argues that CHEP is bullying recyclers, as evidenced by the fact that it has made no effort to prevent its lessees from shipping to NPDs and the fact that it has not targeted uncooperative NPDs for legal action, as it has recyclers such as itself. (Doc. #30 at 8; e.g., Potts Depo. at 76; Southwick Depo. at 50; Buono Depo. at 154; Brumsey Depo. at 68; Miller Depo. at 30.)  However heavy handed CHEP might be acting toward recyclers, relative to how it acts toward other entities in possession of its assets, that fact by itself does not negate its right to assert its legal rights.  No law prevents a person from being selective in choosing its legal battles, however unfairly it might appear as an ethical matter.

44

entitled to summary judgment. Buckeye argues that CHEP has "no legal right" to require it to notify CHEP whenever it receives CHEP pallets. (Doc. #29 at 7.) This argument misses the point. An injunction is an equitable remedy, and if CHEP's argument for an injunction is well taken, then the Court itself can provide CHEP with the legal right to require Buckeye to conform to the terms of the proposed injunction. It is true that, in the abstract, an entity that happens to come into possession of a CHEP pallet involuntarily has no existing legal obligation to notify CHEP of this fact, just as it is true that a person who finds another man's dog or wallet has no obligation to notify the owner of that fact, even where the identity of the dog's owner is clearly indicated on the dog tag, or the wallet's owner is clearly indicated by his driver's license contained therein. Yet, the fact that no duty exists to notify the owner of personal property at the time said property is found, does not mean that the finder has a right to claim the property for himself. Indeed, as just pointed out, doing so constitutes an act of civil conversion. What is more, as the Court's discussion above makes clear, when the true owner learns of the whereabouts of her property and notifies the possessor of her intent to claim it, the possessor has absolutely no right to deny the owner her right to retake possession. To the extent Buckeye stands ready to continue to collect CHEP pallets and deny CHEP its right to take possession of same, this Court is authorized to enjoin it from doing so.[22]  Accordingly, as to this counterclaim, Buckeye's Motion for Summary

---

[22]This is not to say that the Court disagrees with all of Buckeye's concerns. For example, CHEP's Roger Miller expressed the opinion that Buckeye should decline "to do

45

Judgment is OVERRULED.

IV. Conclusion

For the reasons and citations of authority set out herein, Defendant's Motion

for Summary Judgment (Doc. #27) is SUSTAINED as to Counts One, Two, Three

and Five of Plaintiff's Complaint, and is OVERRULED as to Count Four of the

Complaint. Plaintiff's Motion for Summary Judgment on Count One of Its

Complaint (Doc. #30) and its Motion for Summary Judgment on CHEP's

Counterclaims (Doc. #29), are OVERRULED.

Remaining at issue in this litigation is Count Four of Plaintiff's Complaint, for

unjust enrichment, and the three counterclaims raised by Defendant, for replevin,

conversion and permanent injunctive relief.

Because the question of ownership has been decided, the facts conclusively

demonstrating that CHEP has not given up its right of ownership to those CHEP

pallets that are the subject of this litigation, the following motions are hereby

OVERRULED, as moot, because they relate to evidence which concerns the

---

business" with any entity that might by inadvertence include CHEP pallets in the aggregate of pallets left for Buckeye to pick up in bulk in the course of its business. (Miller Depo. at 150.) This might be unreasonable. As CHEP itself recognizes, many recyclers cannot avoid coming into possession of CHEP pallets in their normal course of business. (Potts Aff. ¶13.) In crafting the terms of an injunction, the Court would obviously take into consideration the realities of the pallet recycling business, and potential hardships that might result were Buckeye to be foreclosed from doing business with an entity if there were a possibility of collecting CHEP pallets. The Court is not at that point yet, but points this out to reassure Buckeye that equitable relief is a two-way street.

question of ownership of CHEP pallets: Plaintiff's Motion for Leave to File Motion to

Compel Out of Time (Doc. #45); Plaintiff's Motion for Order to Deem Facts

Admitted (Doc. #48); Defendant's Motion in Limine to Exclude Evidence Regarding

Buckeye's Damages (Doc. #56).

Counsel listed below will take note that a telephone conference call will be

held, beginning at 8:45 a.m. on Thursday, August 21, 2003, for the purpose of

scheduling a trial date and other dates leading to the resolution of this litigation.

August 11, 2003

WALTER HERBERT RICE, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies to:
Counsel of record

47