UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 26 2003

LUTHER D. THOMAS, Clerk
By a.m. Caier
Deputy Clerk

CHEP USA,

    Plaintiff,

v.

MOCK PALLET COMPANY,

    Defendant.

CIVIL ACTION
NO. 1:02-CV-2053-BBM

## O R D E R

This action is currently before the court on the defendant's motion for partial summary judgment [Doc. No. 38-1] and the plaintiff's motion for summary judgment [Doc. No. 41-1].

### Factual and Procedural Background

Plaintiff CHEP USA, a New York partnership (hereinafter "CHEP" or the "plaintiff"), is in the business of providing wooden pallets to its customers for the purpose of transporting such customers' goods. The pallets provided by CHEP differ from most pallets — i.e., "white" pallets — in the wooden pallet industry in that they are painted blue, bear the words "Property of CHEP" painted on their sides and, according to CHEP, because they are "higher quality, longer-lasting and consistently more reliable than common white pallets." Some of the pallets provided by CHEP (hereinafter "CHEP-marked pallets") also bear CHEP's 1-800



59

*telephone number painted on the sides thereof.* According to CHEP, this telephone number is provided in order to facilitate the pallets' return to CHEP, which claims to maintain ownership of all pallets it provides to its customers in the ordinary course of its business.

Indeed, CHEP asserts that, unlike most pallet providers, it never parts with legal title to its pallets. Most companies that deal in wooden pallets treat their pallets as fungible items to be bought, exchanged for other pallets upon delivery, and then re-used until they are destroyed or otherwise rendered unusable. CHEP, on the other hand, enters into agreements with its customers providing that the pallets it provides are for lease only, that the customer may send them to distributors as it would any other pallet, but that the customer will not be entitled to receive any other pallets in exchange for the CHEP-marked pallets. In other words, customers who are party to CHEP's standard pallet agreements receive delivery of CHEP-marked pallets, ship their merchandise to distributors on such CHEP-marked pallets, and then turn around and lease more CHEP-marked pallets from CHEP for further shipments to distributors. Since CHEP customers only send CHEP-marked pallets to distributors, but are not intended to receive pallets from anyone other than CHEP, CHEP refers to its business model as a "one-way" system.[1]

---

[1] By contrast, most of the pallet industry, in which "white" pallets are commonly exchanged upon delivery of pallets by one party to another, is a "two-way" system.

Of course, CHEP's standard-form agreement with its customers comprises only one part of this "one-way" system. As originally conceived, manufacturers party to CHEP's standard-form agreement would ship CHEP-marked pallets only to distributors with whom CHEP also had an agreement (hereinafter "Participating Distributors"). When Participating Distributors received CHEP-marked pallets from CHEP customers, they would arrange for CHEP to retrieve such pallets, and, after receiving such pallets, inspecting them and making any necessary repairs thereto, CHEP would once again send such pallets out to its manufacturer customers. CHEP-marked pallets therefore circulated in a loop: from CHEP, to its manufacturer customers, to Participating Distributors, then back to CHEP, and so on, for the useful life of each pallet.

This closed, "one-way" system has presented some practical drawbacks for CHEP. While this business model is intended to help CHEP maintain quality control over its pallets, and is intended to hold down the manufacturing and environmental costs associated with constantly replenishing its pallet pool, it has been difficult to enforce, especially in light of the practices observed by the rest of the wooden pallet industry. Most significantly, it can only be successful to the extent that CHEP is able to secure and enforce agreements with Participating Distributors, and to the extent manufacturers can be persuaded to deal only with

3

such Participating Distributors. Under this closed system, if a manufacturer wanted to deal with a distributor who was not a Participating Distributor, it could not ship its merchandise to such distributor on a CHEP-marked pallet, at least not without violating its agreement with CHEP. Some manufacturers evidently concluded that this arrangement was an inconvenient impediment to their ability to deal with distributors of their products, and, apparently, this view was made known to CHEP.

In 1998, therefore, CHEP made the "business decision" to open up the closed loop of its "one-way" system in order to permit its manufacturer customers to ship CHEP-marked pallets to distributors with whom CHEP did not have any contractual relationship (hereinafter "Non-Participating Distributors," or "NPDs"). However, in order to create a disincentive for such shipments, and to offset the costs it anticipated it would incur in attempting to recover the CHEP-marked pallets from NPDs, CHEP imposed a surcharge on each pallet a manufacturer sent to NPDs. In addition, CHEP's standard agreement with its manufacturer customers required such customers to inform CHEP as to the identity of any NPD to which such pallets were shipped, in order to assist CHEP in recovering them. To this end, CHEP also periodically sent letters to these NPDs advising them of its ownership interest in the CHEP-marked pallets, providing the NPDs with its toll-free number in case the NPDs did come into possession of any CHEP-marked pallets, and including in such

4

correspondence color fliers depicting a CHEP-marked pallet. These letters, which CHEP had already been sending to identified NPDs since at least the early 1990s, also requested that the NPDs (1) "sort out" the CHEP-marked pallets from "white" pallets, (2) "put them to one side," (3) assist CHEP in "determin[ing] the source of the pallets and the manner in which they are arriving at your premises," (4) telephone CHEP to notify it that the NPD has received CHEP-marked pallets, (5) "remind all your employees that they MUST NOT purchase, collect, repair, modify, sell or otherwise dispose of any CHEP[-marked] equipment" and (6) "allow us to collect the [CHEP-marked pallets] as soon as possible." Some of the letters suggested that NPDs' failure to comply with these requests might constitute criminal conduct,[2] and none of the letters offered NPDs any compensation for their assistance to CHEP in recovering CHEP-marked pallets.

As a result of the change in CHEP's business model permitting its customers to send pallets to NPDs, millions of CHEP-marked pallets are now apparently held by tens of thousands of NPDs and their downstream industry colleagues, pallet recyclers, nationwide. When NPDs have on hand more wooden pallets than needed for their business purposes, they transfer these pallets, including loads wherein

---

[2]Specifically, one version of CHEP's form letters sent to NPDs stated as follows: "We hope that by advising people in this manner we will minimize the risk of violations of the law."

5

CHEP-marked pallets are mixed in with "white" pallets, to paying pallet recyclers. Pallet recyclers take these pallets in bulk and pay discounted prices for them, in order to relieve the NPDs of the cost and other inconvenience associated with storing the pallets. Pallet recyclers then transfer these pallets to other entities, sometimes after some reconditioning, for a marginally higher price than that paid to the NPDs. Some pallet recyclers sell these pallets, or parts thereof, as scrap wood. In addition, some pallet recyclers also apparently sell CHEP-marked pallets to CHEP customers for the specific purpose of helping such customers evade the $24.00 "lost pallet" charge assessed against the customers when periodic audits by CHEP reveal that the customers are in possession of fewer CHEP-marked pallets than they otherwise should be.

Mock Pallet Company (hereinafter "MPC" or the "defendant") is a pallet recycler whose facilities are located in Covington, Georgia. MPC has been acquiring CHEP-marked pallets since 1991, and now has approximately 40,000 to 50,000 CHEP-marked pallets stored at its facilities. In the early- to mid-1990s, CHEP began sending its form letters to MPC, encouraging MPC to sort CHEP-marked pallets from other pallets, to direct its employees to refuse CHEP-marked pallets and to telephone CHEP if MPC were to come into possession of any CHEP-marked pallets. In addition, at least since 1998, CHEP agents have been surveilling MPC's premises,

noting that a fluctuating quantity of CHEP-marked pallets are being stored there. When CHEP's agents would telephone or meet in person from time to time with MPC's owner, Ricky Mock (hereinafter "Mr. Mock"), to attempt to recover the CHEP-marked pallets, they were informed that MPC would only permit CHEP to retrieve such pallets if CHEP were to pay a "storage and handling" fee for them first. CHEP never took MPC up on this offer, but instead, on July 24, 2002, filed the instant action.

In its complaint against MPC, which was amended on July 29, 2003, CHEP asserts four counts for relief. First, in a count entitled "Conversion," CHEP asserts that MPC "has converted the CHEP[-marked] pallets to its own use," "has intentionally and wrongfully interfered with CHEP's possession of CHEP[-marked] pallets," and that it "continues to transfer CHEP[-marked] pallets to third parties." As a result, CHEP asserts that it is entitled to return of the CHEP-marked pallets in MPC's possession, compensation for the lost rental revenue attributable to such pallets and compensatory damages for the CHEP-marked pallets which MPC has purported to sell to third parties. Second, in a count entitled "Permanent Injunction," CHEP requests that the court enter an injunction requiring MPC to contact CHEP within 72 hours after it comes into possession of CHEP-marked pallets and to surrender possession of such pallets to CHEP. Third, in a count

entitled "Punitive Damages," CHEP asserts that MPC's actions in relation to CHEP-marked pallets "have shown, and continue to show, willful misconduct, wantonness, and an entire want of care with regard to CHEP's property rights." In this regard, CHEP alleges that MPC transferred CHEP-marked pallets to third parties during the pendency of this litigation, asserting that such transfers indicate MPC's "decided, conscious indifference to the consequences of its actions." As a result, CHEP asserts that it is entitled to punitive damages pursuant to Ga. Code Ann. § 51-12-5.1. Finally, in a count entitled "Expenses of Litigation," CHEP asserts that MPC "has been stubbornly litigious and has caused CHEP unnecessary trouble and expense." As a result, CHEP asserts that it is entitled to an award of its expenses of litigation pursuant to Ga. Code Ann. §§ 9-15-14 and 13-6-11. In addition to these counts, CHEP's "Prayer for Relief" also requests a "judgment for the value of CHEP[-marked] pallets [MPC] has destroyed"[3] and "such other relief as the Court deems just and equitable."

MPC's answer to CHEP's amended complaint was filed on August 6, 2003. MPC's counterclaim made in conjunction with such answer also asserts four counts

---

[3]Notably, CHEP's briefs in support of its motion and in response to MPC's motion do not direct the court's attention to any evidence that MPC has destroyed any CHEP-marked pallets. Accordingly, the court concludes that CHEP has abandoned such claim. See Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.")

for relief. First, MPC seeks a declaratory judgment by the court that MPC owns the CHEP-marked pallets in its possession. Second, MPC seeks an award of "damages for unjust enrichment," apparently contending that it is "unjust" for CHEP to receive the benefits of MPC's sorting and storage of CHEP-marked pallets without paying for such benefits. Third, MPC seeks an award of "the charges and expenses it incurred in acquiring[ ] and safeguarding the [CHEP-marked] pallets" as a naked depository pursuant to Ga. Code Ann. § 44-12-96. Fourth, MPC also seeks an award of its expenses of litigation, asserting that CHEP "has acted in bad faith, has been stubbornly litigious and has caused [MPC] unnecessary expenses in connection with its assertion of ownership." In addition to these counts, MPC's prayer for relief also requests damages pursuant to Ga. Code Ann. § 9-2-7 and that the court "grant such other and further relief as it may deem just and proper."

On July 10, 2003, MPC moved for partial summary judgment as to all claims in this action except CHEP's counts for a permanent injunction and for punitive damages, MPC's count for a declaratory judgment, MPC's count for its expenses of litigation, and except for the amount of damages to which MPC asserts it is entitled pursuant to Ga. Code Ann. § 44-12-96. On July 14, 2003, CHEP moved for summary judgment as to all claims in this action. The court now considers these motions.

## Discussion

Summary judgment is proper "if . . . there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party may provide affirmative evidence of the non-moving party's inability to prove its case at trial, and summary judgment is mandated if a party cannot establish the existence of essential elements that it carries the burden of proving at trial. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The plaintiff must do more, though, than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. The non-movant may not avoid summary judgment with evidence that is "merely colorable or is not significantly probative." Raney v. Vinson Guard Serv., Inc., 120 F. 3d 1192, 1196 (11th Cir. 1997). Moreover, any factual disputes identified must be material as determined by the substantive law governing the case. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112,

1115 (11th Cir. 1993) ("The substantive law applicable to the case determines which facts are material.").

As noted above, either the plaintiff, defendant or both have moved for summary judgment as to each of the counts set forth in the complaint and the counterclaim. The court will address the bases for the parties' motions in the following order: (1) whether CHEP or MPC owns the CHEP-marked pallets in MPC's possession; (2) whether MPC is entitled to compensation, as a naked depository or otherwise, for its sorting and storage of such pallets; (3) whether MPC is liable in conversion for its actions with respect to such pallets; (4) whether CHEP is entitled to a permanent injunction against MPC regarding any future acquisition of CHEP-marked pallets; (5) whether CHEP is entitled to an award of its attorneys fees against MPC in this action; and (6) whether CHEP is entitled to an award of punitive damages against MPC for MPC's actions with respect to such pallets, and whether MPC is entitled to an award of its expenses of litigation against CHEP in this action. The court addresses each of these bases in turn.

I.    Ownership of the pallets

Unless CHEP can demonstrate the absence of a genuine issue of material fact as to its ownership of the CHEP-marked pallets in MPC's possession, CHEP cannot prevail on any of its claims in this action. MPC argues that CHEP does not own

such pallets, asserting four bases for this argument. First, MPC asserts that it has presumptive title to the CHEP-marked pallets, since such pallets are in MPC's possession. Second, MPC asserts that CHEP's receipt of a "lost pallet" fee from customers is a transfer of title in favor of such customers, which transfer confers upon subsequent purchasers of such "lost" pallets good title therein. Third, MPC asserts that CHEP's agreement with its customers is in the nature of a "*mutuum*," and that, therefore, the failure on the part of a CHEP customer to return a pallet effectively transfers title to such customer. Fourth, MPC asserts that CHEP "entrusts" CHEP-marked pallets to its customers, and that MPC is a "bona fide purchaser for value" of pallets from such customers. Upon review of the applicable law, the court disagrees with each of these assertions.

A.    *Presumption created by MPC's possession*

As noted above, MPC asserts that it has presumptive title to the CHEP-marked pallets, since such pallets are in MPC's possession. The court concludes that this presumption has been defeated by CHEP's introduction of evidence to the contrary.

MPC's possession of the pallets is not conclusive evidence of title. Instead, MPC's possession of the pallets only stands as *prima facie* evidence of its title thereto "until evidence to the contrary is introduced." Powell v. Riddick, 89 Ga. App. 505,

508, 80 S.E. 2d 70, 73 (1954). In this regard, the court notes that CHEP has called the court's attention to paragraph 4 of the affidavit of Keith Norder, CHEP's Senior Vice President, Chief Financial Officer (hereinafter "Mr. Norder"), which states that "CHEP retains ownership of its pallets at all times." Of course, MPC disagrees with this statement to the extent it can be construed as a legal conclusion, and the court is always wary of conclusory (and self-serving) statements offered by an employee of one of the parties to litigation before the court. On the other hand, MPC has not directed the court's attention to any evidence, in the form of a written or oral contract, that would indicate that CHEP failed to retain title.[1] To the contrary, it is undisputed that CHEP has taken active steps to give notice of its claimed ownership interest in its pallets since the early 1990's.

CHEP has also referred the court to paragraph 10 of Mr. Norder's affidavit, which indicates that CHEP pays all applicable state property taxes for CHEP-marked pallets in circulation. However, based upon the court's review of the evidence, this fact does not appear to be clearly established. In his deposition, for

---

[1] In this regard, MPC asserts only that "CHEP does not have a certificate of title on file with any governmental agency evincing ownership for any of the pallets in MPC's possession, nor have they filed any UCC-1s for any of the pallets." While the court recognizes that permissive filings would have been helpful to CHEP's assertion of title, MPC has not directed the court's attention to any authority, binding or otherwise, that would indicate that CHEP is required to make such filings in order to perfect or retain title in the pallets.

example, Mr. Norder could not say one way or the other whether CHEP had paid taxes on their pallets in Newton County, Georgia. At the same time, MPC has not pointed to any evidence that CHEP failed to pay taxes on their pallets.[5] In any event, the court does not find this issue to be dispositive as to the question of title.

Finally, CHEP has called the court's attention to paragraph 6 of its standard-form agreement with its customers, which provides that CHEP-marked pallets "shall at all times remain the exclusive property of CHEP and the Customer has no right to sell or deal with the [CHEP-marked pallets] in any way that is inconsistent with CHEP's ownership of" such pallets. MPC has not called the court's attention to any other agreement, written or oral, in which CHEP or its customers have taken a contrary position, nor has it directed the court's attention to any evidence that it acquired the CHEP-marked pallets in its possession by any route other than by through a CHEP customer subject to CHEP's standard-form agreement.

In all, this evidence adduced by CHEP effectively defeats the presumption of title created by MPC's possession of the CHEP-marked pallets, since it is "evidence

---

[5]In this regard, MPC has called the court's attention to pages 72 through 75 of Mr. Norder's deposition transcript, asserting that this portion of the transcript is evidence that "CHEP did not pay any property tax in Newton County[, Georgia] for any of the CHEP-marked pallets in MPC's possession." MPC's reliance on such evidence is problematic. Mr. Norder's deposition testimony refers to documents Bates-stamped 87 to 668 (apparently produced by CHEP in discovery), however, these documents themselves have not been entered as evidence to support MPC's motion for partial summary judgment. Because these documents are not a part of the evidence before the court, the court cannot rely upon them in determining whether a factual dispute exists.

to the contrary" of MPC's claim to title of such pallets. At the same time, MPC has failed to adduce its own evidence specifically contradicting CHEP's evidence of title. For these reasons, MPC has failed to demonstrate the existence of a genuine issue of material fact as to CHEP's prior title in the pallets.

Having resolved the question of CHEP's original claim of title, the court will also address MPC's next argument, namely, that CHEP could have lost title to the CHEP-marked pallets if it gave "external indicia of the right of disposition of the property." See Jones v. Brown, 108 Ga. App. 776, 779, 134 S.E.2d 440, 444 (1963). In this regard, the court notes that, under Georgia law, the general rule of *caveat emptor* is still applicable, Brown, 108 Ga. App. at 779, 134 S.E.2d at 444; Capital Auto. Co. v. Ward, 54 Ga. App. 873, 876-77, 189 S.E. 713, 715 (1936), subject only to exception where the "true owner" commits "an act calculated to mislead others in regard to the ownership of the property," Harris Loan Co. v. Elliott & Hatch Book-Typewriter Co., 34 S.E. 1003, 1003-04 (Ga. 1900); accord Capital Auto., 54 Ga. App. at 877, 189 S.E. at 715-16, or where, as MPC argues, the owner "has given the external indicia of the right of the disposition of his property." Benton v. Duvall Livestock Mktg., Inc., 201 Ga. App. 430, 430, 411 S.E.2d 307, 308 (1991); Brown, 108 Ga. App. at 779, 134 S.E.2d at 444.

MPC has not, however, directed the court's attention to any act on CHEP's part which was "calculated to mislead others" with regard to the ownership of CHEP-marked pallets, nor has it directed the court's attention to any "external indicia" exhibited by CHEP that anyone other than CHEP had the authority to sell CHEP-marked pallets. To the contrary, all of the evidence of which the court has been made aware is that CHEP took aggressive steps to inform others of its claim of ownership. MPC further argues that CHEP exhibited such "external indicia" by its omissions, i.e., by its alleged failure to maintain control over all CHEP-marked pallets in its "one-way" system. The court has been directed to no authority, however, that stands for the proposition that an omission, as opposed to an affirmative action, suffices to defeat legal title otherwise vested in a "true owner," particularly where such an omission is accompanied by overt proclamations of ownership.

While the court has hereinabove excerpted a portion of paragraph 6 of CHEP's standard-form agreement with its customers, the entirety of that provision of the agreement provides as follows

Restrictions on Use of Equipment

The Equipment shall at all times remain the exclusive property of CHEP and the Customer has no right to sell or deal with the Equipment in any way that is inconsistent with CHEP's ownership of it. THE CUSTOMER HEREBY EXPRESSLY WAIVES ANY AND ALL

LIENS (INCLUDING, WITHOUT LIMITATION, WAREHOUSEMAN'S LIENS), SECURITY INTERESTS OR ANY OTHER LEGAL OR EQUITABLE CLAIMS OF TITLE TO THE EQUIPMENT. Upon request, the Customer shall execute any documents necessary to acknowledge, publish, file and record this Agreement.

The Equipment shall always carry CHEP's identification marks such as the CHEP logo and/or being colored blue. The customer shall not tamper with, duplicate, cover up or remove these marks, or mark the Equipment in any manner. If the Customer marks any Equipment in any way, the Customer shall pay CHEP such charges as may be specified by CHEP to reimburse CHEP for the cost of removing such marks from the Equipment.

Except for Equipment transferred to another CHEP customer or left at a designated CHEP depot, if the Customer transfers possession of any Equipment to any third party (including the Customer's agents) it shall remain responsible for any such Equipment.

The parties have made the court aware of no dispute regarding the fact that this language governed the relationship between CHEP and its customers. Certainly, this language can in no way be construed as "an act calculated to mislead others in regard to the ownership of the" CHEP-marked pallets. Cf. Capital Auto., 54 Ga. App. at 877-78, 189 S.E. at 716 ("If the defendant had wished to protect its title to the car as against innocent third parties . . . it should have reduced its contract to writing, specifically retaining title to the automobile."). To the contrary, the court finds that CHEP's proclamations of ownership throughout the distribution chain expressly began with its customers. The court has been made aware of no customers

who assert that they were misled by CHEP about the fact that CHEP claimed ownership of these pallets.

Accordingly, the court concludes that the presumption created by MPC's possession of the CHEP-marked pallets does not suffice to demonstrate the existence of a genuine issue of material fact as to CHEP's title in such pallets.

B.    *"Lost pallet" fee*

As noted above, MPC also asserts that CHEP effectively conveys title in a CHEP-marked pallet to its customer when it assesses and receives a "lost pallet" fee from such customer.  MPC has not provided the court with any basis to so hold.

As set forth above, paragraph 6 of CHEP's standard agreement with its customers clearly indicates that CHEP-marked pallets "shall at all times remain the exclusive property of CHEP and the Customer has no right to sell or deal with the [CHEP-marked pallets] in any way that is inconsistent with CHEP's ownership of" such pallets.  MPC does not direct the court's attention to any provision of CHEP's standard-form agreement that would contradict this provision, to any other agreement CHEP has with its customers transferring title under such circumstances, or to any parol evidence that would otherwise show an intent by the parties to such agreement to transfer title to the pallets under such circumstances.  Instead, MPC argues that the amount of the "lost pallet" fee, usually $24.00, is equal to or greater

than the value of the CHEP-marked pallet itself, and that payment of such fee therefore transfers title as a matter of law.

As authority for its argument, MPC directs the court's attention to only one case which the court views as holding precedential value in this matter,[6] Stubbs v. Smith, 248 Ga. 768, 769, 285 S.E.2d 720, 721 (1982), and the court's review of this case does not support MPC's "lost pallet" argument. Stubbs concerns the sale of real property by one party on behalf of another, and estoppel of the original owner to contest the title of the purchaser when the original owner received proceeds of such sale in the knowledge that it was his property that was sold. Id. In other words, the parties in Stubbs did not question that the transaction was a sale, but rather, whether the plaintiff should be equitably estopped from seeking to invalidate the sale. In the instant action, by contrast, there is no indication, as a legal or factual matter, that a sale has ever taken place upon payment of CHEP's "lost pallet" fee. The customer's obligation to pay the "lost pallet" fee arises under CHEP's standard-form agreement, yet there is absolutely no indication in the agreement that title is transferred upon payment of the fee. Because the Georgia Supreme Court's opinion

---

[6]MPC also cites as authority for its argument Guidry v. Continental Oil Co., 350 F.2d 342, 345 n.10 (5th Cir. 1965) (applying federal antitrust law, and describing the common-law distinction between a bailment and a sale); Saulsbury Oil Co. v. Phillips Petroleum Co., 142 F.2d 27 (10th Cir. 1944) (applying Texas law); and Kansas Flour Mills Co. v. Board of Comm'rs of Harper County, 124 Kan. 312, 259 P. 795 (1924) (applying Kansas law). The court does not consider these cases persuasive authority in this action.

in <u>Stubbs</u> takes as given a premise that MPC is here attempting to prove, it does not support MPC's argument in this regard. MPC has therefore failed to provide the court with a basis to conclude that a customer's payment of a "lost pallet" fee constitutes a sale of the subject CHEP-marked pallet.

C.   "Mutuum"

As noted above, MPC also asserts that CHEP's delivery of CHEP-marked pallets to its customers is "in the nature of a *mutuum*," and that, therefore, the failure on the part of such customer to return a pallet effectively transfers title to a customer. The court notes, however, that MPC has not directed the court's attention to any authority indicating that the equitable doctrine of *mutuum* has been recognized by Georgia courts.[7] Absent such authority, the holding sought by MPC in this regard is foreclosed to this court.

---

[7]The common law doctrine of *mutuum* generated an interesting discussion in an opinion from the U.S. District Court for the Southern District of Ohio, which was faced with a dispute between CHEP and another pallet recycler. <u>Buckeye Diamond Logistics, Inc. v. CHEP USA</u>, Case No. C-3-01-440, slip op. at 22-30 (S.D. Ohio Aug. 11, 2003). That court's discussion, which was governed by Ohio law, was no doubt what prompted MPC to raise the issue here. Unfortunately, however, as far as this court can discern, the doctrine of *mutuum* has been little recognized, or even discussed, in the jurisprudence of the State of Georgia.

D. *Entrustment*

As noted above, MPC also asserts that CHEP entrusts CHEP-marked pallets to its customers, and that MPC is a "bona fide purchaser for value"[8] of pallets from such customers. This assertion is without merit.

Section 2-403 of Georgia's enactment of the Uniform Commercial Code, Ga. Code Ann. Title 11 (hereinafter the "Code") provides, in relevant part, as follows:

> (1)    A purchaser of goods acquires all title which his transferor had or had power to transfer . . . A person with voidable title has power to transfer a good title to a good faith purchaser for value . . .

> (2)    Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business.

> (3)    "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

---

[8]Georgia's enactment of the Uniform Commercial Code does not define the phrase "bona fide purchaser for value." MPC has apparently borrowed this phrase, used in passing, from the opinion of the Georgia Court of Appeals in <u>Mimick Motor Co. v. Moore</u>, 248 Ga. App. 297, 297 & 299, 546 S.E.2d 533, 535 (2001). The Court of Appeals, describing the argument of the plaintiff therein based on Ga. Code Ann. § 11-2-403(2), was apparently referring to a "buyer in the ordinary course of business." Here, however, the court construes MPC to argue that it was a "good faith purchaser for value," as such phrase is used in Ga. Code Ann. § 11-2-403(1).

Ga. Code Ann. § 11-2-403. MPC argues that CHEP entrusts CHEP-marked pallets to its customers who, in turn, pass voidable title in such pallets to "good faith purchaser[s] for value," as such term is defined in the Code. MPC argues that it has acquired title to the CHEP-marked pallets in its possession as such a "good faith purchaser for value."

MPC's argument in this regard cannot prevail under Georgia law. Georgia courts have consistently interpreted the entrustment doctrine to apply only when goods are delivered to a "merchant," as such term is used in Ga. Code Ann. § 11-2-403(2) and defined in Article 2 of the Code. As used in Article 2 of the Code, the term "merchant" is defined as

> a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

Ga. Code Ann. § 11-2-104(1). In the context of the Code's entrustment provisions, the Georgia Court of Appeals has held that this definition of "merchant" requires "from an objective viewpoint, that the entruster know, or in the exercise of reasonable diligence should know, that he placed the goods with one who might reasonably appear to third persons to be a dealer in the type of goods in question."

Perez-Medina v. First Team Auction, Inc., 206 Ga. App. 719, 721, 426 S.E.2d 397, 399 (1992). "Whether a party is a merchant under the UCC is a question of law for the court." Ready Trucking, Inc. v. BP Exploration & Oil Co., 248 Ga. App. 701, 704, 548 S.E.2d 420, 423 (2001) (citing Perez-Medina, 206 Ga. App. at 721).[9]

In support of its argument that CHEP's customers are "merchants," as defined in Article 2 of the Code, MPC has directed the court's attention to evidence that CHEP's customers "handle lots of pallets in the course of their business."[10] The

---

[9]MPC cites Ready Trucking in its brief in response to CHEP's motion for summary judgment, but its reliance on this case is misplaced. Ready Trucking pertains to whether a purchaser can be considered a "merchant" in the context of Ga. Code Ann. § 11-2-201(2) (relating to the enforceability of contracts "between merchants"), i.e., whether a purchaser is knowledgeable about the goods which he is purchasing. 248 Ga. App. at 704, 548 S.E.2d at 424. The standards set forth in Ready Trucking are therefore not applicable to determine whether a buyer in the ordinary course of business could acquire good title from a "merchant" to whom property had been entrusted.

MPC's reliance on Locke v. Arabi Grain & Elevator Co., 197 Ga. App. 854, 399 S.E.2d 705 (1990) is likewise misplaced. Although MPC cites Locke for the proposition that "occasional merchandising of a trucker satisfied the definition of merchant," this proposition is contained in the *trial court's* summary of a case decided under Nebraska law. 197 Ga. App. at 855, 399 S.E.2d at 706. There is no indication in the Georgia Court of Appeals' opinion in Locke, however, that the court by including this summary intended to abandon Georgia precedent to the contrary and align itself with an interpretation made under Nebraska's enactment of the Uniform Commercial Code.

[10]The "evidence" adduced by MPC in support of its assertion in this regard was an exchange during Mr. Norder's deposition, which occurred in the context of a discussion regarding the obligations of Participating Distributors under their agreements with CHEP. Specifically, when asked by MPC's counsel, "And typically *these customers handle lots of pallets* in the course of their business so they can ship goods on down the line to a participating distributor? Is that typically the scenario?" Mr. Norder responded, "That is a portion of the flow, yes" (emphasis added). Even if the court assumes, *without deciding*, that this exchange constitutes evidence that CHEP's customers "handle lots of pallets in the

handling of pallets does not constitute evidence sufficient to demonstrate that such customers are "merchants" to whom pallets may be entrusted.[11] The evidence before the court does not support a finding that CHEP's customers are "merchants" as contemplated by the definition set forth in Article 2: there is no evidence before the court that CHEP's customers "deal[ ]" in pallets, nor that they "hold[ themselves] out as having knowledge or skill peculiar to" pallets, nor that they are entities "to whom . . . knowledge or skill [peculiar to pallets] may be attributed by [their] employment of an agent or broker or other intermediary who by his occupation holds himself out as having . . . knowledge or skill [peculiar to pallets]." MPC has also failed to direct the court's attention to any evidence that "from an objective viewpoint," CHEP's customers "might reasonably appear to be . . . dealer[s]" in pallets.[12] Since MPC has failed to call the court's attention to any evidence that

---

course of their business," MPC has not otherwise called the court's attention to any evidence regarding the volume or nature of CHEP's customers' "handl[ing]" of pallets.

[11]A library, for example, "handles lots of" books "in the course of [its] business," but it is not a book merchant, as defined by Article 2. As another example, a law firm "handles lots of" paper "in the course of its business," but it is not a paper merchant, as defined by Article 2. Finally, a child care provider may "handle lots of" children "in the course of [his or her] business," but he or she could not therefore be said to be a child merchant, as defined by Article 2.

[12]Cf. Perez-Medina, 206 Ga. App. at 721, 426 S.E.2d at 399-400 (where evidence was adduced that individual who later sold tractor had business that appeared to be a repair shop; that he "held himself out as a merchant in the business of buying and selling the kind of goods at issue, and regularly bought and sold such goods at auctions and in other business transactions"; that the prior owner knew that such individual "was a dealer in the

24

CHEP's customers are "merchants," as such term is used in Ga. Code Ann. § 11-2-403(2), its argument that it has obtained title pursuant to such provision fails.[13] Cf. Greater S. Distrib. Co. v. Usry, 124 Ga. App. 525, 184 S.E.2d 486 (1971) (summary judgment was error, under Georgia law, where defendant claiming title pursuant to an entrustment had not demonstrated that he had purchased goods from individual who met the definition of "merchant" set forth in Article 2).

In summary, the court has concluded that MPC has failed to demonstrate the existence of a genuine issue of material fact as to CHEP's ownership of the CHEP-marked pallets in MPC's possession, since (1) CHEP has overcome the presumption of title created by MPC's possession of such pallets, (2) MPC has not shown any

---

type of goods in question"; and that the prior owner "knew, or should have known, that [the individual] might reasonably appear to third parties to be such a dealer"); Simson v. Moon, 137 Ga. App. 82, 222 S.E.2d 873 (1975) (where evidence indicated that wrecker truck had been entrusted to a wrecker truck dealer); Rockwin Corp. v. Kincaid, 124 Ga. App. 570, 184 S.E.2d 509 (1971) (where evidence indicated that mobile home had been entrusted to mobile home dealer); Christopher v. McGehee, 124 Ga. App. 310, 183 S.E.2d 624 (1971) (where evidence indicated that automobile had been entrusted to automobile dealer).

[13]MPC also argues that it has acquired title to the CHEP-marked pallets in its possession as a "buyer in the ordinary course of business" or a "good faith purchaser for value." This argument likewise fails. Even if MPC were a buyer in the ordinary course, MPC has not shown how it has acquired title other than by entrustment. Also, even if MPC were a good faith purchaser, it has not shown how the entities from whom it received the CHEP-marked pallets acquired even "voidable" title, see Ga. Code Ann. § 11-2-403(1) (requiring that a seller have "voidable" title in order to empower such seller to transfer a good title to a good faith purchaser for value). Also, although MPC argues that the "shelter rule" confers upon MPC good title in the CHEP-marked pallets in its possession, MPC has not directed the court's attention to any authority indicating that Georgia courts have extended this doctrine to transactions covered by Article 2 of the Code.

basis for the court to conclude that CHEP's receipt of a "lost pallet" fee from customers constitutes a transfer of title in favor of such customers, (3) Georgia courts do not recognize the equitable doctrine of "mutuum," and (4) MPC has not called the court's attention to any evidence that CHEP's customers are "merchants" to whom CHEP "entrusts" CHEP-marked pallets pursuant to Ga. Code Ann. § 11-2-403. Accordingly, the court will hereinafter GRANT CHEP's motion for summary judgment as to MPC's count requesting a declaratory judgment as to title in the CHEP-marked pallets in its possession.[14]

II.  _Compensation for sorting and storage_

As noted above, MPC seeks an award of "the charges and expenses it incurred in acquiring[ ] and safeguarding the [CHEP-marked] pallets" as a naked depository pursuant to Ga. Code Ann. § 44-12-96. MPC also seeks an award of "damages for

---

[14]MPC also argues that CHEP "ratifies" NPD's purported sales of CHEP-marked pallets to other entities, such as MPC, by "accept[ing] the benefits from shipping to NPD's." In support of this argument, MPC directs the court's attention to several cases that relate to the ratification by a *principal* of the actions of its *agent*, see Pharr v. Olin Corp., 715 F. Supp. 1569 (N.D. Ga. 1989); Griggs v. Dodson, 223 Ga. 164, 154 S.E.2d 252 (1967); Lewis v. Citizens & S. Nat'l Bank, 139 Ga. App. 855, 229 S.E. 2d 765 (1976), one case relating to the ratification by trust beneficiaries of the actions of a trustee, see Lugue v. Hercules, Inc., 12 F. Supp. 2d 1351 (S.D. Ga. 1997), and another case, decided under Iowa law, that does not relate to ratification at all. See Rotterman v. General Mills, Inc., 245 Iowa 229, 61 N.W.2d 718 (1953). Given that MPC has failed to call the court's attention to any evidence or legal authority that would indicate that NPDs act in the capacity of agents for CHEP, or that CHEP is the beneficiary of a trust with regard to which an NPD serves as a trustee, such authority is inapposite. MPC has therefore failed to provide the court with any basis to conclude that CHEP "ratifies" NPD's purported sales of CHEP-marked pallets to third parties.

unjust enrichment," apparently contending that it is "unjust" for CHEP to receive the benefits of MPC's sorting and storage of CHEP-marked pallets without paying for such benefits. Georgia law defines a "naked deposit" as "an undertaking whereby a depository keeps chattels for another gratuitously," Ga. Code Ann. § 44-12-90(3), and provides that "[o]ne who holds a naked deposit is entitled to be reimbursed for all charges and expenses which he incurs by reason of the deposit, and he may retain possession of the deposit until such charges and expenses are paid." Ga. Code Ann. § 44-12-96. MPC asserts that it is a "naked depository" as would be covered by this provision, that it is therefore entitled to compensation from CHEP for its sorting and storage of CHEP-marked pallets, and that CHEP would be unjustly enriched by MPC's sorting and storage of the CHEP-marked pallets if it did not compensate MPC for such services. The court agrees with these assertions.

In this action, CHEP's standard-form agreement with its customers acknowledges that its customers send CHEP-marked pallets to entities with whom CHEP has no contractual relationship, and indeed permits its customers to do so.[15] Despite the absence of such a relationship, however, CHEP customarily requests

_____

[15]Notably, CHEP has not directed the court's attention to any evidence that MPC acquired the CHEP-marked pallets in its possession other than through CHEP's own customers.

that such entities (1) "sort out" the CHEP-marked pallets from "white" pallets, (2) "put [CHEP-marked pallets] to one side," (3) assist CHEP in "determin[ing] the source of the pallets and the manner in which they are arriving at your premises," (4) telephone CHEP to notify it that the NPD has received CHEP-marked pallets, (5) "remind all your employees that they MUST NOT purchase, collect, repair, modify, sell or otherwise dispose of any CHEP[-marked] equipment" and (6) "allow [CHEP] to collect the [CHEP-marked pallets] as soon as possible." Moreover, the correspondence entailing such requests does not offer such entities compensation for their compliance with these requests. Given that CHEP has directed the court's attention to evidence that MPC is one of the entities of whom CHEP has made such requests, the court concludes that CHEP has asked MPC to "keep[ CHEP-marked pallets] for [CHEP] gratuitously." Accordingly, the court concludes that MPC is, as a matter of law, a "naked depository" of CHEP-marked pallets.

Under Georgia law, naked depositories have a statutory lien "on the property in their possession for any expense incurred in caring for the property." Ga. Code Ann. § 44-14-410. The Supreme Court of Georgia has suggested that such a lien is equivalent in amount to the "reasonable hire" for the expenses so incurred. Savannah Steam Rice-Mill Co. v. Hull, 103 Ga. 831, 833-34, 30 S.E. 952, 953 (1898) (interpreting Ga. Code § 2813 (1895), a predecessor to § 44-14-401); see also Postell

v. Val-Lite Corp., 78 Ga. App. 199, 203-04, 51 S.E.2d 63, 65-66 (1948) (applying Ga. Code §§ 12-301, 12-307, 12-701, 12-702 and 12-711 (1933), predecessors to §§ 44-12-90, 44-12-96, 44-14-400, 44-14-401, 44-14-410, respectively); Morrow Transfer & Storage Co. v. Whitson, 20 Ga. App. 149, 92 S.E. 761 (1917) (applying Ga. Code § 3362 (1910), a predecessor to § 44-14-400, in a case where a warehouseman withheld stored property on grounds that the storage charges remained unpaid).

Accordingly, the court concludes that MPC, as a naked depository of CHEP-marked pallets, holds a lien on the CHEP-marked pallets in its possession for an amount equal to the "expense incurred in caring for" such pallets, which amount the court concludes to be equivalent to the "reasonable hire" for MPC's compliance with CHEP's requests with regard to such pallets. The court will therefore GRANT MPC's motion for partial summary judgment as to its count asserting a right to compensation under Ga. Code Ann. § 44-12-96 and as to its count claiming unjust enrichment, and DENY CHEP's motion for summary judgment as to such counts. Since MPC has not moved for summary judgment as to the amount of the compensation or damages to which it is entitled as to these counts, further proceedings are warranted to determine such amounts.[16]

---

[16]In addition, as noted above, MPC asserts that it is entitled to damages under Ga. Code Ann. § 9-2-7. This statute provides, in relevant part, that "[o]rdinarily, when one renders service or transfers property which is valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof." Ga. Code Ann. § 9-2-7. MPC

III.  Conversion

As noted above, CHEP asserts in its amended complaint that MPC "has converted the CHEP[-marked] pallets to its own use," "has intentionally and wrongfully interfered with CHEP's possession of CHEP[-marked] pallets," and that it "continues to transfer CHEP[-marked] pallets to third parties."  The court disagrees, in part, with this assertion.

On the one hand, an action for conversion cannot lie when the defendant's possession of the subject property was lawfully acquired. Wood v. Sanders, 87 Ga. App. 84, 86, 73 S.E.2d 55, 56 (1952); accord Cotton v. Pendley, 130 Ga. App. 552, 552, 203 S.E.2d 758, 759 (1974); Colonial Credit Co. v. Williams, 95 Ga. App. 76, 76, 97 S.E.2d 197, 197 (1957).  As noted above, MPC was a naked depository of CHEP-marked pallets, having lawfully acquired such pallets by virtue of CHEP's permissive release thereof to entities with whom it has no contractual relationship,[17] and was therefore entitled to "retain possession of the deposit until . . . [all] charges and expenses [incurred by reason of the deposit] are paid." Ga. Code Ann. § 44-12-96. Also, as a naked depository, MPC was a rightful lienholder in the CHEP-marked

has not, however, directed the court's attention to any evidence indicating that CHEP has, to date, "accept[ed]" any service or property from MPC.

[17]As noted above, CHEP has not directed the court's attention to any evidence that MPC acquired the CHEP-marked pallets in its possession other than through CHEP's own customers.

pallets stored on its premises. Under such circumstances, MPC's refusal to surrender the pallets absent satisfaction of the lien was not wrongful, as such a surrender would have effectively forfeited such lien. See Turner v. Priest, 48 Ga. App. 109, 111-13, 171 S.E. 881, 883 (1933) (construing Ga. Code § 3363 (1910), a predecessor to § 44-14-401); see also Cotton, 130 Ga. App. at 552, 203 S.E.2d at 759 (holding that no action for conversion will lie where the defendant retains possession pursuant to a special lien). Accordingly, since MPC lawfully acquired the CHEP-marked pallets in its possession, and since, as a lienholder in such pallets, it did not wrongfully withhold them from CHEP, no action in conversion lies with regard to the pallets still located on MPC's premises.

On the other hand, however, CHEP has directed the court's attention to evidence that MPC has transferred at least 1,200 CHEP-marked pallets to third parties since the inception of this litigation. See R. Mock Dep. at 178-80. These transfers are inconsistent with MPC's status as a naked depository of the CHEP-marked pallets, and would constitute conversion of such pallets. See Wood, 87 Ga. App. at 87, 73 S.E.2d at 57 (where a defendant in trover acts in a manner inconsistent with the rights of the owner of the property, such actions amount to conversion). This evidence also indicates, however, that the specific CHEP-marked pallets sold by MPC during this time had been acquired by MPC prior to the four-year period

*preceding* the inception of this litigation. See R. Mock Dep. at 179; see also Ga. Code Ann. § 9-3-32 (requiring that "[a]ctions for the recovery of personal property, or for damages for the conversion or destruction of the same . . . be brought within four years after the right of action accrues"). Since CHEP has not directed the court's attention to any evidence that the pallets sold by MPC were acquired *within* the four-year period preceding the inception of this action, it has failed to demonstrate a genuine issue of material fact as to its ability to recover any damages for the conversion of such transferred pallets. See Maslia v. Hall, 121 Ga. App. 740, 743, 175 S.E.2d 48, 51 (1970) ("Abandonment, of course, may result from . . . failure to bring an action for the recovery of the personalty within four years."); accord Walden v. Jones, 252 Ga. App. 692, 694, 556 S.E.2d 566, 567 (2001) (also holding that "[a]n owner may abandon personal property by acts of commission and omission").

In light of the court's conclusion that, as a matter of law, MPC lawfully acquired the CHEP-marked pallets in its possession and did not wrongfully withhold such pallets, and given that CHEP has failed to demonstrate the existence of a genuine issue of material fact that the CHEP-marked pallets MPC has transferred since the commencement of this litigation were acquired prior to the four-year period preceding the inception of this litigation, the court will hereinafter

GRANT MPC's motion for partial summary judgment and DENY CHEP's motion for summary judgment as to CHEP's claim of conversion.

## IV.    Permanent injunction

As noted above, CHEP asserts in its amended complaint that it is entitled to a permanent injunction requiring MPC to contact CHEP within 72 hours after it comes into possession of CHEP-marked pallets and to surrender possession of such pallets to CHEP.  CHEP has failed to establish that, as a matter of law, it is entitled to a permanent injunction upon the evidence it has presented.

In cases, such as this one, where federal jurisdiction obtains by virtue of the diversity of the parties, state law governs the availability of injunctive relief.  See Wheelabrator Corp. v. Fogle, 438 F.2d 1226, 1226 (5th Cir. 1971) (applying state law in diversity action to determine the availability of injunctive relief); Aerosonic Corp. v. Trodyne Corp., 402 F.2d 223 (5th Cir. 1968).[18]  In this regard, Georgia law provides

_____

[18]Decisions of the United States Court of Appeals for the Fifth Circuit which were decided prior to October 1, 1981 are binding as precedent for the Court of Appeals, district courts and bankruptcy courts in the Eleventh Circuit.  Bonner v. City of Pritchard, 661 F.2d 1206, 1209-11 (11th Cir. 1981).  In Aerosonic, the former Fifth Circuit held that

> Since Erie R. Co. v. Tompkins, it is the law that where federal jurisdiction is based on diversity of citizenship and not on the federal Constitution or some Act of Congress, a federal court is in effect only another court of the state in which it sits and applies the same law that would be applied if the action had been brought in state courts.  It follows that in diversity cases the federal courts cannot allow recovery if the right to recover is denied by the state, and this is true regardless of the form of the action and whether the remedy is sought at law or in equity. *The outcome of litigation in federal court with respect*

that "[e]quity, by a writ of injunction, may restrain . . . a threatened or existing tort, or any other act of a private individual or corporation which is illegal or contrary to equity and good conscience and for which no adequate remedy is provided at law." Ga. Code Ann. § 9-5-1. According to the Georgia Court of Appeals, injunctive relief is available where (1) there is "no adequate remedy at law" other than injunctive relief, (2) "the evidence show[s] that the plaintiff would suffer irreparable harm" absent the requested relief, and (3) "in balancing the harm to the parties, . . . the [trial] court in the exercise of its discretion [finds] that equity demand[s] the grant of the injunction." City of Duluth v. Riverbrooke Props., Inc., 233 Ga. App. 46, 55, 502 S.E.2d 806, 814 (1998).

"Injunction is an extraordinary process," however, and, "being so, it should never be granted except where there is grave danger of impending injury to person or property rights, and a mere threat or bare fear of such injury is not sufficient." Thomas v. Mayor, etc. of Savannah, 209 Ga. 866, 867, 76 S.E.2d 796, 797 (1953). Moreover, it is clear that, under Georgia law, courts may only resort to injunctive relief "in clear and urgent cases." Hobbs v. Peavy, 210 Ga. 671, 672, 82 S.E.2d 224, 226 (1954). In this regard, the court notes that CHEP has failed to direct the court's

---

*to a state[-]created right[ ] should be the same as it would be in the state court.*

402 F.2d at 229 (internal citations omitted, emphasis added).

attention to any evidence that it "would suffer irreparable harm" if a permanent injunction did not issue. Although CHEP asserts that, without an injunction, it would be forced to bring "successive lawsuits" to recover pallets from MPC, CHEP has not called the court's attention to any evidence that MPC intends to withhold CHEP-marked pallets from CHEP even after the court adjudicates the parties' respective interests in such pallets. Absent such evidence, the court concludes that CHEP's request is founded on little more than a "bare fear" that MPC will not recognize CHEP's ownership interest in CHEP-marked pallets. Accordingly, CHEP has failed to provide the court with any basis to grant the extraordinary remedy of injunctive relief at this juncture. The court will therefore DENY CHEP's motion for summary judgment as to this count of its complaint.

V.     CHEP's claim for its expenses of litigation

As noted above, CHEP also asserts that it is entitled to an award of its expenses of litigation pursuant to Ga. Code Ann. §§ 9-15-14 and 13-6-11. In its brief in response to MPC's motion, however, CHEP premises this assertion entirely on (1) its claim that MPC converted the CHEP-marked pallets in its possession, a claim which the court has already concluded is without merit, and (2) the terms of Ga. Code Ann. § 13-6-11, a provision which applies solely to actions arising in contract, not tort. Accordingly, the court will hereinafter GRANT MPC's motion for partial

summary judgment and DENY CHEP's motion for summary judgment as to this claim. See Clarke v. Cox, 197 Ga. App. 83, 84, 397 S.E.2d 598, 600 (1990) ("[P]unitive damages are not supportable where the tort is not proved.") (quoting Associated Software Consultants Org., Inc. v. Wysocki, 177 Ga. App. 135, 138, 338 S.E.2d 679, 682 (1985)).

## VI.  CHEP's claim for punitive damages & MPC's claim for its expenses of litigation

Although CHEP has moved for summary judgment as to all claims in this action, CHEP has failed to make any legal arguments or direct the court's attention to any evidence in support of its claim for punitive damages, and MPC has failed to make any legal arguments or direct the court's attention to any evidence in support of its claim for its expenses of litigation. The court therefore concludes that CHEP and MPC have abandoned these claims. See Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").[19] Accordingly, the

---

[19]Rule 56 compels this conclusion, since

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322-23.

court will hereinafter DENY CHEP's motion as to its claim for punitive damages and GRANT CHEP's motion as to MPC's claim for its expenses of litigation.

## Conclusion

The defendant's motion for partial summary judgment [Doc. No. 38-1] and the plaintiff's motion for summary judgment [Doc. No. 41-1] are hereby GRANTED IN PART AND DENIED IN PART, as follows:

1.   As to the plaintiff's count asserting a claim of conversion, the court hereby GRANTS the defendant's motion and DENIES the plaintiff's motion as to such count.

2.   As to the plaintiff's count asserting a right to a permanent injunction, the court hereby DENIES the plaintiff's motion.

3.   As to the plaintiff's count asserting a right to punitive damages, the court hereby DENIES the plaintiff's motion.

4.   As to the plaintiff's count seeking an award of its expenses of litigation, the defendant's motion is hereby GRANTED and the plaintiff's motion is hereby DENIED.

5.   As to the defendant's count seeking a declaratory judgment that it owns the CHEP-marked pallets, the court hereby GRANTS the plaintiff's motion.

6. As to the defendant's count seeking damages for unjust enrichment, the court hereby GRANTS the defendant's motion and DENIES the plaintiff's motion.

7. As to the defendant's count seeking compensation as a naked depository, the court hereby GRANTS the defendant's motion and DENIES the plaintiff's motion.

8. As to the defendant's count seeking an award of its expenses of litigation, the court hereby GRANTS the plaintiff's motion.

9. The court hereby DIRECTS that the parties shall each bear their own costs in this action.

Further proceedings in this matter are warranted only for the limited purpose of determining what constitutes a reasonable fee for the sorting and storage of CHEP-marked pallets at MPC's facilities. The parties are hereby ORDERED to file their proposed consolidated pretrial order no later than 30 days following entry of this order on the docket of the court.

IT IS SO ORDERED, this 26th day of September, 2003.

BEVERLY B. MARTIN
United States District Judge