IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CHEP USA, a New York partnership, ) | |
| ) | |
| Plaintiff, ) | Civil Action File |
| ) | No. 1: 02-CV-2053-BBM |
| vs. ) | |
| ) | |
| MOCK PALLET COMPANY, ) | |
| a Georgia Corporation ) | |
| ) | |
| Defendant. ) | |

## MOCK PALLET COMPANY'S TRIAL BRIEF

**A.   CHEP is unjustly enriched.[1]**

CHEP's pallet pool was originally designed so that the pallets never leave the control of CHEP or entities authorized by CHEP to use the pallets. In 1998, CHEP, seeking to mollify its major customers who complained of having to keep inventories of white and blue pallets, permitted 110 manufacturers to ship CHEP-marked pallets to non-participating distributors or NPD's. Those NPD's: (A) Do not have a contractual obligation to return the CHEP-marked pallets under fear of

---

[1] CHEP's paltry payments under its Asset Recovery Program (ARP) are based on what CHEP decides it costs a recycler to return lost pallets to CHEP. This is not the correct measure of damages based on unjust enrichment. The Court wrote, "The measure of damages…under unjust enrichment is based upon the benefit conferred upon the [recipient] and not the cost to render the services or the cost of the goods." Op., at 13.

1

being assessed a $24.00 Lost Pallet Fee; (b) do not tell CHEP where they ship the pallets; and (c) sell CHEP-marked pallets.

CHEP knew that it would experience difficulty in recovering pallets that go to NPD's. Nonetheless, because of the lucrative nature of this business and its desire to keep its major customers, CHEP chose to permissively release millions of pallets into the stream of commerce, not knowing when, if ever, they would be returned. As the number of NPD's grew,[2] the number of pallets out of CHEP's control also grew, since CHEP cannot track the pallets when NPD's sell pallets to recyclers, or to CHEP's customers to lessen the impact of CHEP's $24.00 Lost Equipment Fee.

Despite being unable to locate millions of pallets, CHEP refuses to eliminate contracts that allow the shipments to NPD's[3]. In January, 2002, there were 9.83 million pallets out of CHEP's control. In June, 2003, there were approximately 8.5 million CHEP-marked pallets out of the direct control of CHEP; at the time of the April, 2004 trial there were 6.9 million lost pallets. In November, 2005, CHEP, despite having reclaimed 4.5 million lost pallets since 2002, there are still 5.3

---

[2] In February, 2003, CHEP was not recovering from the NPD's 200,000 pallets a month. (Dep. Potts, pp. 72-73 – 6/3/03).

[3] If CHEP eliminated the contracts to NPD's, there would be 6 or 7 million fewer pallets per year shipped to NPD's (Dep. Potts, p. 93 – 11/14/05). CHEP ships approximately 550,000 to 600,000 pallets a month to NPD's (Dep. Potts, p. 10-11 – 11/14/05).

million lost pallets, despite a massive budget committed to finding them. Thus, in almost four (4) years, CHEP has reclaimed less than 50% of the pallets that it declared lost in 2002.

Commencing in 2001, CHEP imposed a $3.50 per pallet surcharge for shipments to cooperative NPD's and an "expensive" $8.00 per pallet for its favored customers to ship to hostile NPD's. The genius of the CHEP model is that if and when CHEP finds the lost pallet, it never returns the surcharge to its participating manufacturer. The same is true of CHEP's standard $24.00 Lost Equipment Fee, which is levied upon participating distributors that lose pallets. As the Court recognized, CHEP has already collected either a surcharge for those lost pallets at MPC that were shipped to NPD's, or a Lost Pallet Fee of $24.00 for each pallet lost by a participating distributor (Order Denying Motion for Reconsideration, p. 14, Fn. 10). Thus, when CHEP retrieved the 40,834 pallets from MPC, it received an immediate gain of $3.50, $8.00 or $24.00 per pallet, and the opportunity to re-rent the pallets until CHEP loses them again.[4]

CHEP's system has evolved to be more profitable to CHEP, and more unjust to recyclers who refuse to accede to CHEP's bullying ways. Its Asset Recovery

---

[4] CHEP's "super computer" does not track the movement of individual pallets (even those subject to a lawsuit) and therefore cannot provide information as to how much CHEP has already received for a particular pallet, or the total amount of revenue generated from each pallet after they were picked up at MPC. (CHEP's Response to Interrogatory No. 10 of MPC's Post-Appeal Interrogatories).

Program (ARP), which offers recyclers a measly pittance and a fraction of what CHEP has already collected, increases CHEP's already swollen coffers by seeking to cram an unjust program down the throats of recyclers initially by utilizing the threat of criminal sanctions and now through threat and the use of nationwide civil litigation.[5]

MPC, a pallet recycler, makes money by acquiring white wood pallets and then recycling them for sale. MPC does not want CHEP's pallets[6], as MPC pays money to acquire them and is not allowed to sell them. CHEP expects MPC to stop its white wood business and return the same pallets for free or at a loss, that CHEP has permissively released to entities who CHEP knows will sell them to others.

**B.     The 11th Circuit ruled that CHEP has been unjustly enriched.**

---

[5] Naturally a recycler, for whatever reason, can agree to this unjust price, just like the Fortune 100 customer can agree to pay what Potts called an "expensive" surcharge. It is unjust, when in the absence of contract, a recycler feels compelled to purchase a CHEP-marked pallet or risk losing its customer and then not being allowed to sell what it purchased, while at the same time CHEP amasses surcharges and Lost Pallet Fees.

[6] CHEP could end this problem by eliminating these lucrative contracts to its NPD's, but it chooses not to. It could also permit recyclers to sell the pallets. Instead, it wants to have its cake and eat it too, as it seeks to restrict the free flow of commerce, while reaping a hefty "ransom" from its customers. Hence, both this Court and the 11th Circuit realize that its model, while legal, is unjust. Hence it should be required to disgorge its gain.

The 11th Circuit ruled that it is unjust[7] for CHEP to require MPC to return the lost pallets to CHEP for free or at a loss. It held that the doctrine of unjust enrichment applies to this case, since: (A) A benefit has been conferred on CHEP; (B) There is no legal contract between CHEP and MPC; and (C) CHEP's business model forces MPC, a stranger to the contractual relationship between CHEP and its customers, to bear CHEP's costs of locating its pallets, for a price dictated by CHEP, or else risk losing its customers; and (D) CHEP forces MPC and other recyclers to bear the cost of a "business decision" in which CHEP (MPC's largest competitor) collects a surcharge of $8.00 per pallet, and then sets in motion a sequence of events that results in these unwanted pallets coming into MPC's possession. However, unlike the white pallets it collects, these pallets come with an interdict prohibiting MPC from selling them. Thus, equity requires CHEP, despite an absence of a contract and a civil wrong (unless being a commercial bully is a tort), to give to MPC the enrichment CHEP's inequitable business model has secured. Peter Birks, <u>Unjust Enrichment and Wrongful Enrichment</u>, 29 Texas L. Rev. 1767 (2001).

---

[7] Throughout its trial brief, CHEP seeks to equate unjust enrichment with quantum meruit. They are different, as quantum meruit relies upon an implied promise of compensation, or an expectation by Plaintiff that services be rendered at an agreed upon price that would be paid. See <u>Cochran v. Ogletree</u>, 244 Ga. App. 537, at 540 (a)(536 S.E.2d 194) (2000). See also, O.C.G.A. § 9-2-7.

Thus, liability in unjust enrichment has to do with "wealth being in one person's hand when it should be in another person's." Restitution measures the remedy by the Defendant's [CHEP's] gain and seeks to force disgorgement of that gain in order to prevent the Defendant's unjust enrichment. Restitution which seeks to prevent unjust enrichment of the Defendant [CHEP] differs in principle from damage, which measures the remedy by the Plaintiff's [MPC's] loss and seeks to provide a compensation for that loss." Birks, supra, at 1789.

## C. Georgia's Measure of Damages Under Unjust Enrichment.

The unjust enrichment doctrine provides "that a party should not be allowed to profit or enrich itself inequitably at another's expense." White v. Arthur Enterprises, 219 Ga. App. 124(1) (464 S.E.2d 225) (1995); and that "the unjustly enriched party should pay for its gain." Yoh v. Daniel, 230 Ga. App. 640, at 641(1) (497 S.E.2d 392) (1998).

In J.C. Penney Company, Inc. v. West, 140 Ga. App. 110, at 111-112 (2) (230 S.E.2d 66) (1976), J.C. Penney sent the wrong pension plan to West. When West refused to return the money mistakenly sent to him (he had the same name as a California employee who had worked for Penney much longer), J.C. Penney filed suit.

The Court held that J.C. Penney, despite being at fault by carelessly sending the California employee pension to the Georgia employee West, was entitled to

6

recover the money, since no one should be able to unjustly enrich himself at the expense of another, and it would be unconscionable for West (who was not at fault) to retain money that did not rightfully belong to him.

Similarly, where a nursing home, by mistake, was refunded money from the Georgia Medicaid Program to which it was not entitled, the State, in equity, had a right to demand repayment of the money mistakenly sent. Dept. of Health v. Perry, 123 Ga. App. 816, at 819-120(2) (182 S.E.2d 493) (1971).

Therein, Medicaid sent notice that it was terminating benefits to the nursing home as of February 7, 1968. However, the accounting division of the State Health Department erred and sent checks totaling $5,672.81 to the operation of the nursing home. She cashed the check, and the State sued.

The Court held that even though the mistake of sending the checks was negligence on the part of the State, this does not allow the Defendant to enrich herself at the State's expense. Hence, the remedy was the disgorge her gain and to return the $5,672.81 to the State. See also, Smith v. Huckebae, 232 Ga. App. 374, at 376 (2) (501 S.E.2d 877) (1998) (holding that despite the parties' contract being unenforceable, Huckebae could still seek relief under the doctrine of unjust enrichment for the value of improvements he made to Smith's property.) Evans v. Evans, 237 Ga. 549, at 553 (228 S.E.2d 857) (1956) (even in the absence of contract, or a provision in the Will, Ralph Evans, could recover in his personal

capacity against the Estate for enhancing the value of the Estate to prevent unjust enrichment).

In <u>Yoh v. Daniel</u>, 230 Ga. App. 640, at 641 (1) (497 S.E.2d 392) (1998), after the Yohs reneged on their deal to sell a house to the Daniels, they returned the earnest money which the Daniels cashed. Consequently, the contract was cancelled. Notwithstanding the absence of a contract, the jury awarded the Daniels actual damages which exceeded their actual out-of-pocket loss in making improvements to the house in anticipation of the sale. The <u>Yoh</u> Court, in affirming this judgment, held that the jury was authorized to award the value of the improvements, even if they exceeded the costs of the material and labor, since "the unjustly enriched party should pay for its gain," which, in this case, was the added value of the house, <u>supra</u>, at 641.

In <u>Felker v. Chipley</u>, 246 Ga. App. 296, at 297 (540 S.E.2d 285) (2000), Felker used partnership money for his personal investments. In one (1) year, the evidence showed that the money he invested earned a return of 16.37 percent. The Court ruled that not only did Felker have to return the principal (the remedy for the wrongful breach of a fiduciary duty), but he also had to give back the 16.37% return he earned, because it was unjust that he be enriched at Chipley's expense, <u>supra</u>, at 297.

D. **The Evidence on Unjust Enrichment in This Case.**

MPC intends to introduce evidence as to alternative methods for calculating the amount of CHEP's commercial advantage and gain for permissively releasing its pallets to hostile NPD's who do not return them.

By way of illustration, but not meant by way of limitation, MPC calculates CHEP's gains in the following manners:

(1) Each time that MPC returns a lost pallet to CHEP (40,834 pallets at trial), CHEP gains $20.00 per pallet, as evidenced by CHEP's original Complaint in this case. Thus, CHEP owes MPC $816,600.00 for those pallets;

(2) Each pallet returned to CHEP results in an immediate gain of $8.00 (if the pallet had been shipped to an NPD) or $24.00 (if CHEP had collected a Lost Pallet Fee). This is an immediate gain upon return, as CHEP has a policy wherein it does not return this money upon receipt of the lost pallets. CHEP has admitted that it is possible that it has already collected $3.50, $8.00, or $24.00 for each pallet it has picked up from MPC. (Trial, Vol. II, Potts, p. 47).

Furthermore, since a lost pallet does not generate revenue for CHEP when it is returned, CHEP resumes generating revenue. Thus, CHEP's gain would be calculated by its immediate gain derived by not returning a Lost Pallet Fee or a surcharge coupled with the revenue generated by this found pallet for the duration of its useful life.

(3) CHEP's gain, as detailed in the Kolb memo and the subsequent emails, will not be discussed in detail, so as to not have to put his numerical conclusions in public view.[8]

MPC has no duty to mitigate its damages, since unjust enrichment sounds neither in tort in contract, and the 11th Circuit has decided as a matter of law based on a record that included that defense (as well as unclean hands) that CHEP has been unjustly enriched as a matter of law.

Furthermore, the 11th Circuit ruled that "as in the case of a naked depository," we think that refusal to turn the pallets over without reasonable payment would not be wrongful where the result would be unjust enrichment of the pallets' owner. Op., at 6.

The focus of the Court's inquiry as to the condition of the pallets (CHEP is clueless as to the condition of any pallet when they arrived at MPC's yard, or the number of different entities who may have had the pallets or the number of

---

[8] CHEP has chosen to declare the memo and the emails as "Outside Attorney's Eyes Only" material. Thus, it produced this material under seal, and MPC will not go into its content at this juncture. CHEP's conduct in listing Mr. Kolb as an expert and then repudiating his methodology and conclusions, and then claiming that his memo commissioned by their CFO, detailing the benefits CHEP gains by paying recyclers is irrelevant. makes one wonder how, on the other hand, CHEP considers this memo as a highly confidential document not to be divulged to the public. In any event, it is an admission of a party under F.R.E. 801(d) 2D; City of Tuscaloosa v. Harcross Chemicals, 158 F.3d 548, at 557-558 (11th Cir. 1998).

unauthorized repairs, etc.) should be prior to this suit, when CHEP had ample opportunity to make reasonable payment and disgorge the surcharge and the Lost Pallet Fees it had already amassed. Instead it chose to engage in litigation, which is now almost four (4) years old. Thus, it should bear the responsibility for its bad business decision in not making "reasonable" payment when it had the opportunity to do so. It should not be permitted to cast the cost of any "incremental damage" on MPC when the 11th Circuit and this Court both ruled that MPC was justified in not turning over the pallets to CHEP.

This result is even more compelling at bar, since: (1) In 1998 CHEP knew the pallets were being housed outdoors; (2) In March, 2000, CHEP sought to retrieve its pallets that were housed outdoors, but CHEP did not even offer to pay for the pallets; (3) CHEP waited seventeen (17) months to return to Covington to make an effort to return its pallets which it knew were being housed outdoors;[9] (4) CHEP made an unreasonable offer to pay MPC $0.75 per pallet, provided MPC transports the pallets to McDonough. This unreasonable offer was rejected, as it would have required MPC to work for CHEP, its largest competitor, for a loss; (5) Six months later, on March 27, 2002, CHEP revisited MPC, but did not make a reasonable offer to retrieve the pallets; and (6) On April 9, 2002, CHEP's final

---

[9] CHEP notes, during the 9-14-01 trip to Covington, that "the CHEP pallets looked in great shape" (CHEP 003266). Notwithstanding that fact, CHEP never made a reasonable payment, as required by the 11th Circuit, Op. p. 6.

11

offer was for MPC to transport pallets (whose average purchase price at that time was $1.25) to McDonough for $1.50. Again, CHEP unreasonably requested that MPC stop everything or work for a loss, as its average purchase price at that time was $1.25. The 11th Circuit agreed that this offer was unreasonable as a matter of law, as it found that summary judgment in favor of MPC was warranted as a matter of law on CHEP's general conversion claim.

Thus, CHEP assumed the risk of any incremental damages by virtue of the length of time these pallets were exposed to the outdoors, as it was CHEP who acted unreasonably during the course of the negotiations, and it was CHEP who acted negligently and who assumed any risk of the pallets being housed outdoors.

CHEP's relative inaction with regard to the subject pallets, from 1990 to when it sued MPC in July, 2002, was eloquently described by Russell, a CHEP manager, who stated that CHEP did not look after its pallets for the seventeen (17) months between March 2000 and September 2001, because he had a "mental lapse" and because he said, "I had bigger fish to try to get" (Dep. Russell, p. 50).

Neither equity nor law "will assist those who neglect to take care of themselves." Phillips v. Hayes, 212 Ga. 148, at 149 (91 S.E.2d 19) (1956). Equity will not grant relief to one who, by the exercise of ordinary diligence, could have prevented what CHEP now claims is incremental damage. Prince v. Friedman, 202

Ga. 136, at 140(2)(142 S.E.2d 434) (1947). Moreover, "equity aids the vigilant, not the slothful." Raines v. Clay, 161 Ga. 574, at 576-578 (131 S.E. 499) (1925).

Thus, CHEP should not be entitled to any offset since: (1) CHEP's actions in not furnishing reasonable payment to MPC was determined by the 11th Circuit to be unreasonable as a matter of law; (2) CHEP assumed any risk of incremental damage; and (3) MPC was under no duty to return these pallets to CHEP until ordered to do so by this Court (after the first trial and after CHEP posted an appeal bond based on the jury verdict of $584,000.00); (4) The 11th Circuit already ruled adversely to CHEP on all of its equitable defenses."

Moreover, CHEP should not be permitted to charge MPC for its costs in retrieving the subject pallets, as to this date CHEP has still not made reasonable payment, and if it wants to get back the property that was lost through its own business practice of permissively releasing them to hostile NPD's, it should at the very least be responsible for the cost of picking them up.

**E.     CHEP's Claim for Specific Conversion.**

MPC sold 1,970 abandoned CHEP-marked pallets. CHEP should not be allowed a double recovery, as this Court noted for each such pallet, CHEP has already either recovered a Lost Pallet Fee or a surcharge (Order Denying CHEP's Motion for Reconsideration, p. 14, Fn. 10).

Potts testifies, in a modified version of the Kolb analysis (on the benefit that CHEP gains when a recycler such as MPC returns a lost pallet), that CHEP has sustained losses on each pallet sold by MPC, as follows: (1) $1.91, which is the cost of collecting a lost pallet from an NPD; (2) $1.80, which is the weighted cost of a capital for CHEP having to bury a replacement pallet; and (3) $1.53, which is the cost of depreciation that CHEP incurs for a total of $5.24.[10]

Thus, since CHEP has already collected either a surcharge or a Lost Pallet Fee in excess of this "loss" (or gain if it were to have recovered the lost pallet), it should not be entitled to offset any damages in this case.

F.      **The Rule Against Speculative Evidence.**

In this trial, because of CHEP's poor record keeping, to wit, its inability to track individual pallets, calculations of CHEP's gain would have to be based on what they claim is their average or standard fee or recovery rate, as they do not track individual pallets, or on an analysis such as that performed by CHEP's expert witness Kolb. Needless to say, CHEP should not be allowed to hide behind its own record-keeping and cry "speculation," as it does in its trial brief.

In McCannon v. McCannon, 231 Ga. App. 601 (499 S.E.2d 684), the Court stated that "in evaluating the sufficiency of evidence regarding damages, the ability to estimate damages to a reasonable certainty is all that is required, and mere

---

[10] At his deposition, Potts testified that CHEP claimed $3.71 per pallet. In the Pretrial Order, CHEP added the third dimension.

difficulty in fixing the exact amount will not be an obstacle to the award. The rule against the recovery of vague, speculative or uncertain damages relates more especially to the uncertainty of the cause, rather than the uncertainty as to the measure of damages." <u>Shepherd v. Aaron Rents, Inc</u>., 208 Ga. App. 139, at 143(3) (430 S.E.2d 67) (1993); <u>Little Tree v. Fields</u>, 240 Ga. App. 12, at 14 (2a) (522 S.E.2d 509) (1999) (holding that it is not necessary for a party seeking specific damages to submit exact figures, provided the estimate is not guesswork); <u>Page v. Braddy</u>, 255 Ga. App. 124, at 126 (524 S.E. 2d 538) (2002) (holding that the trier of fact must be able to calculate the loss from the evidence); <u>Maiz v. Vrani</u>, 253 F.3d 641, at 664 (11th Cir., 2001) (holding that while damages cannot be based on speculation or guesswork, it is enough if evidence shows the existence of damages as a matter of just and reasonable inference).

In <u>ISS International v. Widmer</u>, 264 Ga. App. 55, at 62, 589 S.E.2d 820 (2003), the Court found that Plaintiff Widmer's testimony as to the sums owed him and sums he owed ISS provided the jurors with "data sufficient to estimate with reasonable certainty the amount of the damages."

Similarly, in <u>McCannon, supra</u>, at 602-603, the Court found that the evidence construed in favor of Plaintiff provided the jury with a basis to estimate Plaintiff's damages. Therein, Defendant Sara McCannon admitted that she had previously testified at a deposition that the assets of the two corporations were

worth between $800,000.00 and $1 million dollars. Although at trial, she stated that was inaccurate, the Court held that that claim, at most, creates a jury question. Defendant Allen McCannon admitted that in his deposition, he valued the corporations at between $600,000.00 and $800,000.00. The Court held that his testimony "constitutes some evidence upon which a jury could make a determination of Plaintiff's damages." McCannon, supra, at 602.

This 19th day of June, 2006.

         BALLARD, STEPHENSON & WATERS, P.C.

         By:__s/Eugene D. Butt_____
           Eugene D. Butt
           Attorney for Mock Pallet Company
           Georgia Bar No. 099987

1148 Washington Street
P.O. Box 29
Covington, Georgia  30015
(770) 786-8123
Email: bswlaw_jennifer@bellsouth.net