IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CHEP USA, a New York Partnership, | : : : | |
| Plaintiff, | : : | |
| v. | : : : | CIVIL ACTION FILE NO. 1:02-CV-2053-BBM |
| MOCK PALLET COMPANY, a Georgia Corporation, | : : : | |
| Defendant. | : | |

## **O R D E R**

This matter came before the court for a trial without a jury on June 26, 2006. This June 26, 2006 trial was the second trial of the dispute between the parties in this court. Because some issues were eliminated by virtue of the first trial, as well as the appeal of this court's rulings made prior to and during that trial, the remaining issues are straightforward.

The court's only remaining job is to establish, based upon the evidence presented to it: (1) the amount by which plaintiff Chep USA ("Chep") has been "unjustly enriched" due to the efforts of defendant Mock Pallet Company ("Mock") in purchasing, sorting and for some time storing some 40,814 Chep pallets that came into the possession of Mock; and (2) the damages to Chep resulting from the sale of

some 1,970 pallets, owned by Chep, and sold by Mock prior to the time Chep's ownership had been established.

## RELEVANT FACTS

This dispute arose between Chep and Mock as a result of their mutual participation in the wooden pallet industry. Wooden pallets are widely used in shipping goods through commerce. Historically, wooden pallets have been made of white wood, and upon shipment, have simply become the property of retailers, or distributors who received products on them. As a general practice, these retailers or distributors would either retain the pallets for re-use or sell them to pallet recyclers. Ricky Mock ("Mr. Mock") is a pallet recycler, and Mock is his company. His wife, Nancy Mock ("Mrs. Mock"), works for Mock as well.

Chep entered the pallet market by manufacturing a pallet which is distinctive, and with a business plan that was new to the industry as well. Chep's pallets are painted a distinctive blue color, and are, according to Chep, higher in quality than the white wood pallets that had previously populated the industry. Each Chep pallet is stamped with the words "Property of Chep." Chep's original business plan called for it to retain ownership and control of its blue pallets by way of written agreements entered into between Chep and any business to which its pallets were shipped.

Pursuant to these written agreements, Chep customers were charged a "lost pallet fee" for each pallet they could not return to Chep.

As its business grew, some of Chep's customers wanted the ability to receive goods on Chep pallets, but not be required to retain and return those pallets to Chep. Chep changed its business model to allow this. Chep customers who wanted the freedom to forward Chep pallets into the stream of commerce paid a surcharge for that right. As a result of this change in Chep's business plan, and the resulting entry of the Chep pallets into the stream of commerce, many Chep pallets began to come into the possession of pallet recyclers like Mock.

Despite Chep's change in its business model, Chep continued to vigorously asserts its claim of ownership of its pallets that came into the possession of persons with whom Chep had no agreement. Indeed as a part of this effort, Chep filed this lawsuit, now many years ago, alleging conversion on the part of Mock for simply having come into possession of Chep pallets. During the course of this litigation, Chep's ownership of its pallets has been established as a matter of law, and that question need be discussed no further here.

From the perspective of the pallet recyclers, Chep's business model and its ownership of the pallets that have entered the stream of commerce have created inefficiencies in the market. For example, Mr. Mock has testified that he conducts his

pallet recycling business by buying tractor-trailer loads of pallets, sight unseen, from businesses who sell excess pallets. He testified that since it has been established, as a matter of law, that Chep does retain ownership of its pallets, he would like to avoid coming into possession of Chep pallets and thereby undertaking the obligation of segregating, retaining and returning (or allowing Chep to come onto his property to retrieve) the Chep pallets. Indeed Mr. Mock referred to the Chep pallets as a nuisance. However, he and his wife have testified that Mock cannot avoid coming into possession of the Chep pallets, because the sellers from whom he gets his pallets would stop doing business with him if he required them to segregate the Chep pallets out of the tractor trailer load its sells to Mock.

## THE CURRENT DISPUTE

As set forth above, the court's job at this point in the dispute between the parties is to arrive at the amount by which Chep was "unjustly enriched" by Mock's purchasing, segregating and storing 40,814 Chep pallets, as well as the value of the 1,970 pallets which Mock sold prior to the time that Chep's ownership of those pallets had been established.

Evidence Regarding Value of Chep Pallets

Elton Potts, who is the Senior Vice President of Asset Management for Chep ("Mr. Potts"), testified that the replacement value of a pallet is $18.79.[1] Mr. Potts also testified that Chep's starting position with its customers is to negotiate for a lost pallet fee of $24.00, although he testified that customers can, and do, negotiate down from there. In an effort to avoid having to replace its pallets which have been shipped out, Chep also creates incentives for its customers to use its pallets in such a way that will help Chep control recovery of those pallets. Originally, Chep customers were charged a surcharge of $0.35 to $1.50. However, when Chep changed its business plan in such a way to give its customers more freedom to send its pallets forward into the stream of commerce, it raised the surcharge to its own customers to $3.50 for each pallet that was shipped to a pallet user who was willing to work with Chep in returning the pallets, and $8.00 for each pallet which was to be shipped to a user with whom Chep had no relationship. Because of prior commitments, there were Chep customers to whom these exact surcharges did not apply, but these surcharges

---

[1] Mr. Potts testified during his deposition that a new pallet cost Chep $20.00, but during his testimony at this trial, he revised that figure downward to $18.79. There is other testimony from a Chep employee as to the cost of a new Chep pallet. In doing his evaluation of the Asset Recovery Program in 2001, Mr. Glen Kolb ("Mr. Kolb"), Chep's current Director of Finance, testified that he valued a new pallet at $21.00. He also valued the oldest pallets in Chep's inventory at $7.00 per pallet.

are the rule, not the exception.

## Chep's Efforts to Recapture Pallets from the Stream of Commerce

Chep's business plan places preeminent importance on retrieving Chep pallets that have entered the stream of commerce. In addition to the "Property of Chep" stamp, Chep maintains a toll-free number by which businesses that come into possession of Chep pallets (or presumably conscientious citizens) can call in the location of Chep pallets.

However, Chep's most effective tool in recapturing its pallets is the company philosophy. Mr. Potts testified, "We always go to get them. We do not abandon them." (Tr. of Bench Trial 160:6-7, June 26, 2006.) He also said, "We have used the phrase, never leave a pallet behind, yes ma'am." (Id. 160:10-11.) The court inquired as to whether Chep would go pick up a pallet and tear it up, rather than leave it unclaimed, and Mr. Potts said, "Yes, Ma'am. We do not abandon [our pallets] and [this practice] tells our employees every pallet is important and every pallet can and should be productive." (Id. 160:16-18.) Indeed, because of the increased manpower and emphasis Chep has placed on recovering Chep pallets which have entered the stream of commerce, Chep is now recovering 115 pallets for every 100 pallets which

are shipped out.[2] Despite this collection rate, Mrs. Mock testified at trial that Mock is still coming into possession of approximately 300 Chep pallets per month.

The intangible value given by Chep to pallets that leave its control is underscored by the enormous efforts Chep took to get the pallets which had come into Mock's possession. When this legal action finally reached a point at which the parties could agree to allow Chep to take back its pallets which had come into Mock's possession, Chep went to enormous effort and expense to do so. Chep did this despite the undisputed fact that many of the pallets were in a greatly deteriorated condition. As the court understands the evidence in the case, first in June 2004, then again monthly, beginning in approximately January 2006, Chep recovered the 40,814 pallets which the parties agree were in Mock's possession.

Chep presented evidence regarding the expenses associated with the six times it has gone onto Mock property to take possession of its pallets (June 2004; December 2005 - January 2006; March 2006; April 2006; May 2006; and June 2006). Chep's

---

[2]This number has also changed during the duration of this lawsuit. According to testimony at the first trial, in 2004 Chep was recovering about 99 per cent of its pallets which were shipped out. In 2002, Chep had 9.96 million of its pallets which had been shipped out, and not returned. Chep's testimony at the time of the June 26, 2006 trial was that this 9.96 million had been reduced to only 3.8 million pallets outstanding. This backlog of "lost pallets" explains Chep's ability to now recover more pallets than it ships out.

figures are $11,435.37 for equipment; $3,480.00 labor; $11,611.48[3] for travel expenses in connection with the June 2004 and the December 2005 - January 2006 collections; and $19,565.04 paid to J.B. Hunt for transporting the pallets. Additionally, Chep felt that the collection of these pallets was important enough to send Chep employees to McDonough, Georgia and spend substantial amounts of time, at company expense, for at least the June 2004 collections and the December 2005 - January 2006 collections. For example, according to travel vouchers provided to the court, David Heinzmann (presumably a Chep employee) stayed in a motel in McDonough a total of 26 nights in connection with the first collection of pallets during the summer of 2004. Mr. Heinzmann also made another trip to McDonough during this same time

---

[3] These amounts come from Chep's demonstrative exhibit number 5. Although the court has utter confidence that Chep had reasons for including or excluding the amounts that it did in the "travel expense" category, the court's calculation came out differently than Chep's. For example, when the court adds the numbers from the travel and expense forms of David Heinzmann for his trips to McDonough during June through September 2004, the court arrives at $7,922.91, whereas Chep's travel expense for the June 2004 collection totals $6,662.95. With regard to the December 2005 - January 2006 collection, Chep's "travel expense" amount was $4,948.00, and when the court added up the travel and expense forms for Barry Littleton and Steven Payne, the court's number is slightly below Chep's number.

In assessing the value of these pallets to Chep, the court is also mindful that Chep has provided the court with no travel expense amounts for the collections which took place monthly between March and June 2006, and neither has it provided any information about the salary expense Chep incurred by devoting Mr. Heinzmann, Mr. Littleton and Mr. Payne to the collection of these pallets. Finally, the other expense that is unknown to the court is the no doubt enormous expense of actively litigating this case over a span of four years to date.

period but did not stay overnight.

## Asset Recovery Program

Part of Chep's emphasis upon reclaiming its pallets has also come in the form of a program Chep refers to as its Asset Recovery Program. Originally in this program, pallet recyclers were compensated $0.50 per pallet if Chep picked them up, and $1.50 if the recycler delivered the pallets to a Chep service center. In 2003, Chep changed this program, to pay $1.25 per pallet if the pallets were loaded onto a Chep truck, or $2.25 per pallet if the recycler delivered the pallet to a Chep service center. In connection with the delivery of Chep pallets, the recycler is also given a "transportation surcharge" if the recycler has to travel more than 200 miles in making the delivery. Mr. Mock has declined to participate in this program because he does not believe that it sufficiently compensates him and his company for the personnel and equipment which would be required in order to participate. Mock has also asserted a concern about incurring liability if an automobile accident occurred during the course of a Mock employee transporting Chep pallets back to a Chep facility.

As a part of Chep's development of its Asset Recovery Program, it called upon Mr. Kolb to do a cost benefit analysis of the program. Mr. Kolb was employed by Chep as the director of business analysis in the global function at the time in 2001 he

was given this assignment.[4] Mr. Kolb was asked to evaluate whether it would be worthwhile for Chep to pay recyclers $1.50 for pallets, and he found that it would. He further found a range within which recyclers could be paid that would make financial sense to Chep. That range was from $0.80 to $1.18 on the low end, to $2.40 to $4.67 on the high end of the range. Mr. Kolb testified that if Chep could be assured that paying recyclers for pallets could guarantee that 100% of all lost pallets would be returned, such a result would justify a payment of $7.75 per pallet. However, Mr. Kolb testified that this 2001 calculation of the value of a returned pallet to Chep would be different today as to a single recycler.

DISCUSSION

In its consideration of this matter, the Eleventh Circuit gave specific instruction to this court regarding the test for arriving at the amount by which Chep has been unjustly enriched by Mock's buying, segregating and storing the Chep pallets. That measure of damages as set forth by the Eleventh Circuit is "based upon the benefit conferred upon the [recipient] and not the cost to render the service or cost of the goods." Chep USA v Mock Pallet Co., 138 Fed. Appx. 229, 235 (11th Cir. 2005) (citing Hollifield v. Monte Vista Biblical Gardens, Inc., 251 Ga. App. 124, 130-31 (2001)). For

---

[4]As mentioned above, Mr. Kolb's position was Director of Finance for Chep at the time of the trial.

this reason, the court will make no findings of fact regarding the cost incurred by Mock in buying, segregating and storing the Chep pallets.

Beyond all of the evidence which the court has heard about the monetary value of these pallets over the years, the evidence has overwhelmingly demonstrated that controlling Chep pallets in the stream of commerce holds an enormous intangible value for Chep. Specifically, if Chep pallets were allowed to be abandoned into the stream of commerce, Chep's business plan, and likely therefore Chep itself, would fail.

Chep argues that the court should simply award to Mock that amount that Chep pays recyclers in its Asset Recovery Program. The court does not feel so constrained. All of the evidence known to the court, as well as the positions taken by Chep in this lawsuit, demonstrate that Chep is quite capable of aggressively negotiating with recyclers who have come into possession of Chep pallets. It is the court's view that in these negotiations between Chep and individual recyclers, Chep is in a comparatively strong position to obtain a favorable deal as to the payments it makes pursuant to the Asset Recovery Program. Mr. Kolb's numbers indicate that Chep has indeed done so, as he testified that the program would still be worthwhile

to Chep if it paid up to $7.75 per pallet.[5]  The court is also mindful that during the years of the Asset Recovery Program, Chep has already significantly increased the amount it pays under the program once in response to the demands of the recyclers. It has also added the fuel surcharge to what it pays some recyclers.  Because the recapture of its pallets is so vital to Chep's business plan, it would certainly not be surprising to the court to see further upward adjustments to Chep's payments under the Asset Recovery Program.  Mr. Kolb's 2001 analysis shows that there is still a substantial margin within which the payments to recyclers could grow, while continuing to provide a benefit to Chep.

The court has considered all of the values which Chep has in any way attributed to its pallets during all stages of use.  For example, the court has considered, among other things:  (1) the cost of a new pallet to Chep ($18.79 - $21.00); (2) the cost Chep assigns to the oldest pallets in its inventory ($7.00); (3) the state of

---

[5]The court is not ignoring Chep's argument that Mr. Kolb's numbers have been made obsolete by the Asset Recovery Program.  Rather the court is rejecting it.  Chep has argued in paragraph 22 of its proposed Findings of Fact that the probability of avoiding losing a pallet has decreased as the Assert Recovery Program has become more effective. However, the court has heard no evidence that the Asset Recovery Program has resulted in Chep being even slightly less interested in recovering *every single Chep pallet*, by whatever means.  Further, as the years go by, and the cost of fuel increases (presumably the cost of timber as well), the court reasons that the return of pallets would become more valuable to Chep, not less.  This continues to be so despite the existence of the Asset Recovery Program.

disrepair of the pallets recovered from Mock; (4) the cost the market will bear in terms of the fees Chep collects from its customers for lost pallets (standard charge $24.00, but can be less); (5) the cost the market will bear in terms of surcharges paid by customers who want to use Chep pallets, but not be so tightly bound to enforce Chep's ownership rights (currently $3.50 - $8.00); (6) the expense Chep is willing to incur to regain possession of Chep pallets, regardless of the condition of those pallets; (7) Mr. Kolb's calculation as to how much Chep could pay recyclers for pallets, and still receive value ($0.80 - $1.18 to $2.40 to $4.67, and ultimately up to $7.75); and (8) the intangible value to Chep of reclaiming possession of all of its pallets. Having considered each of these factors, the court finds that Chep was unjustly enriched by Mock's purchasing, segregating and storing Chep's pallets in the amount of $5.00 per pallet. This value is for the Chep pallets on Mock's property. There is no legal obligation for Mock to deliver the pallets to Chep.

### Pallets Sold by Mock

Although both parties appear to be persuaded of their own position that the value of each Chep pallet sold by Mock is different from the value derived by Chep from those pallets which had been in Mock's possession, the court is not. The court is aware that Mr. Mock was paid $4.00 apiece for the 1,970 pallets which he sold. However, for all the reasons set forth above, the court finds that each of the pallets

lost to Chep into the stream of commerce as a result of Mock's sale of those pallets is also valued at $5.00 per pallet.

## SUMMARY

Judgment shall be entered in favor of Mock in the amount of $194,220.00 (40,814 pallets x $5.00 minus 1,970 pallets x $5.00 = $204,070.00 - $9,850.00 = $194,220.00). All issues pending in this matter having been resolved, this action is DISMISSED.

IT IS SO ORDERED, this 18th day of August, 2006.

s/Beverly B. Martin<br>
BEVERLY B. MARTIN<br>
UNITED STATES DISTRICT JUDGE